**Ilona HORVATH, Plaintiff–Appellant,**

v.

**WESTPORT LIBRARY ASSOCIATION, Maxine Bleiweis, in her official capacity as Library Director, and Bonnie J. Moon, in her official capacity as Business Manager, Defendants–Appellees.**

Docket No. 02–9326.

United States Court of Appeals, Second Circuit.

Argued: April 28, 2003.

Decided: March 11, 2004.

---

Thomas W. Bucci, Willinger, Willinger & Bucci, PC, Bridgeport, CT for Plaintiff–Appellant.

Loraine M. Cortese-costa, Durant, Nichols, Houston, Hodgson & Cortese–Costa, PC, Bridgeport, CT for Defendants–Appellees.

Before: VAN GRAAFEILAND, MINER, POOLER, Circuit Judges.

POOLER, Circuit Judge.

Plaintiff Ilona Horvath's complaint asserts claims under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and 42 U.S.C. § 1983. A Report and Recommendation, dated September 16, 2002, of the U.S. District Court for the District of Connecticut (Smith, Magistrate Judge) recommended that the defendants be granted summary judgment on both of these claims. The Report and Recommendation was adopted in an Order, dated October 3, 2002 (Squatrito, J.). On this appeal, Horvath only challenges the grant of summary judgment as to her Section 1983 claim.

## BACKGROUND

Horvath began working for the Westport Library Association ("the Library"), located in Westport, Connecticut ("the Town"), in October 1989 as a "business manager assistant." She was discharged on December 29, 2000. The Library contends that Horvath was terminated because of her resistance to the implementation of new payroll technology and because of general incompetence.

Horvath's Section 1983 claim is based upon her contention that the Library violated her right to due process by not affording her notice and an opportunity to be heard prior to termination. The district court, however, rejected Horvath's Section 1983 claim because the Library was not a state actor, and was therefore not charged with affording its employees due process before terminating them. Because Horvath has dropped her ADEA claim, the only facts germane to this appeal are those that are relevant to the Library's status as a state actor.

We note at the outset that both parties rely heavily upon factual findings contained in two written decisions of the Connecticut State Board of Labor Relations ("the Board"), one from 1977 and one from 1989, issued in cases in which the Library was a party. Both of these cases involved disputes between the Library and the labor union representing its staff members regarding whether the Library was a "municipal employer" within the meaning of Connecticut law. The Library states in its brief on this appeal that these factual findings are "consistent with the Library's current status," except to the extent set forth in an affidavit filed in the district court by the Library's current Director.

We emphasize, however, that, although both the 1977 and 1989 Board opinions concluded that the Library was not a "municipal employer" under Connecticut law, these conclusions are clearly irrelevant to our consideration of whether Horvath should have been afforded the due process

protections available to public employees under federal law. As the magistrate judge correctly noted, the Library "cannot transform the *legal conclusions* reached in 1977 and 1989 into facts by reiterating them ... as if they were *facts.*" Thus, while the paucity of the record gives us no alternative to relying upon the factual findings set forth in the Board decisions, we emphasize that our legal conclusions regarding Horvath's Section 1983 claim are independently derived.

The 1977 Board decision contains the following factual findings that we believe are relevant to the instant appeal:

1. The Westport Library Association is a non-stock corporation created by a special act of the [Connecticut] General Assembly in 1907 with the right to acquire, hold, and manage such property as may be necessary for establishing and maintaining a public library in the Town of Westport, and to "make such by-laws, rules, and regulations ... as it shall deem best for the management of the property and affairs of said Association."

\* \* \* \* \* \*

3. Under the Library by-laws the Library director is appointed by its board of trustees and has charge of the administration of its affairs under the direction and review of a board of trustees. This includes the responsibility for the care of the building and equipment; the hiring, disciplining, and promotion of employees, and the supervision of their duties; responsibility for the service to the public and the operation of the library under the financial conditions set forth in the budget.

\* \* \* \* \* \*

5. One half of the trustees of [the] Library are designated by the Town.

6. [The] Library has some income from investments, gifts, and fines and rentals, but the bulk of its annual income comes from an appropriation from the general funds of the Town. The operating budget for 1976–7 was $545,210 of which the Town appropriation was $489,345.

\* \* \* \* \* \*

12. None of the current trustees of [the] Library is an employee or official of the Town.

The 1989 Board decision contains the following additional relevant findings of fact:

2. The Library is governed by a Board of Trustees composed of 14 voting members.

3. Seven (7) members of the Library's Board of Trustees are appointed by the Representative Town Meeting of the Town of Westport.... The other seven (7) Trustees are appointed by the Board of Trustees themselves.

\* \* \* \* \* \*

4. None of the current seven (7) Trustees who were appointed by the Representative Town Meeting are elected or appointed officials of the Town of Westport.

5. The Director of the Library is appointed by the full Board of Trustees. The Director is responsible for hiring the Library's Department Heads who in turn hire the members of the staff.

6. The operations of the Westport Public Library are funded by a budget (1988–89) that is composed of (1) grants from the Town of Westport, (2) gifts, (3) investments, (4) fines, and (5) rentals. 88% of the budget is composed of grants from the Town of Westport.

7. The Library's budget process entails creation of a preliminary budget request by the Library staff which is

presented to the Board of Trustees for their approval. If approved, the Library staff and Board of Trustees present the budget request to and participate in meetings with the Town's Board of Finance. The Town's Board of Finance ultimately recommends a budget to the Representative Town Meeting for final approval. The final budget allocation is in a lump sum and is without restriction as to expenditure by the Library.

As already noted, the 1977 and 1989 Board decisions have been supplemented by an affidavit of the Library's current Director. The affidavit contains the following information concerning the Library's budget:

The Library's budget for FY 2000–2001 was $3,187,644 with 86.5% of $2,777,494 coming from the Town of Westport. The remainder of the Library's funding comes from private fundraising, fines, late fees and profits derived from a café, which it owns and runs on premises.

In her own affidavit, Horvath discloses that she, along with the rest of the Library's staff, is a member of a union which is only identified in the record as the Brotherhood of Municipal Employees ("the Union"). Also in the record is a copy of the collective bargaining agreement between the Library and the Union in force at the time of Horvath's discharge. The agreement provides that a staff member may only be discharged "for just cause" and that, if discharged, the staff member "shall be given the reason therefor, in writing, within three (3) days with a copy to the Union President." The agreement also provides for a three-stage grievance procedure for "[a]ny grievance or dispute which may arise between the parties concerning the interpretation or application of any provision" of the collective bargaining agreement. The first two stages involve internal dispute resolution procedures and the third is an appeal to the Board. We also note that the agreement enrolls Library staff members in the Town's municipal employee pension plan.

It is unclear whether Horvath followed the first two stages of the collective bargaining agreement's grievance procedure, but she did appeal her discharge to the Board. A three-member panel of the Board—composed of a "Public Member," a "Management Member," and a "Labor Member"—held a hearing on the matter on January 8, 2001. Horvath was represented at the hearing by the President of the Union, and a decision was issued on February 15, 2001. The decision states that "[t]he ultimate issue" for the panel's consideration is whether Horvath was discharged for just cause, but that "a threshold question [was] whether the Westport Public Library [was] a municipal employer and thus subject to the due process requirement of the Fourteenth Amendment of the U.S. Constitution." As to the latter issue, the panel majority summarily reaffirmed the 1977 and 1989 Board decisions holding that the Library was not a municipal employer. The majority also found that the evidence of Horvath's "shortcomings" was so extensive as to make it "self-evident" that she was discharged for just cause.

The "Labor Member" of the panel issued a dissenting opinion. In his view, the Library qualified as a municipal employer because "it [was] clear that a symbiotic relationship exist[ed] between the Westport Public Library and the State of Connecticut, because the Library receive[d] appropriations from the Town and the State." In addition, he believed that the evidence demonstrated that Horvath was "a loyal employee with twelve years of service [who] was given a constructed [sic] termination."

## DISCUSSION

A district court's grant of a summary judgment motion is subject to de novo review. *See Mitchell v. Shane*, 350 F.3d 39, 47 (2d Cir.2003) All evidence submitted on the motion is to be construed in the manner most favorable to the nonmoving party. *Id.*

Again, the substance of Horvath's § 1983 claim is that the Library violated her right to due process when it terminated her without prior notice and an opportunity to be heard. There is no question that "[a] public employee who has a right not to be fired without 'just cause' . . . has a property interest in her employment that qualifies for the[se] protections of procedural due process." *Otero v. Bridgeport Hous. Auth.*, 297 F.3d 142, 151 (2d Cir. 2002) (internal quotations and brackets omitted). As already noted, the collective bargaining agreement between the Library and the union representing Horvath provides that members of the Library staff can be fired only for just cause.

■ The issue that remains for us is whether Horvath was a public employee when she worked for the Library. The right to due process established by the Fourteenth Amendment applies only to government entities, and an attempt to vindicate that right through a Section 1983 claim can be lodged only against a government entity. *See Rendell–Baker v. Kohn*, 457 U.S. 830, 837–38, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982). Accordingly, "[t]he ultimate issue in determining whether a person [may bring] suit under § 1983 is the same question posed in cases arising under the Fourteenth Amendment: is the alleged infringement of federal rights 'fairly attributable to the State?'" *Id.* at 838, 102 S.Ct. 2764 (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982)). The magistrate judge answered this question in the negative, although it noted that "the question appears closer than defendants allow." We believe that the question must be decided in Horvath's favor.

■ As a general matter, defining the limits of the State's presence tends to be a difficult endeavor because of the protean character of contemporary government activity. The Supreme Court has noted something like this in its most recent substantial statement on state action doctrine:

> What is fairly attributable [to the government] is a matter of normative judgment, and the criteria lack rigid simplicity. From the range of circumstances that could point toward the State behind an individual face, no one fact can function as a necessary condition across the board for finding state action; nor is any set of circumstances absolutely sufficient, for there may be some countervailing reason against attributing activity to the government.

*Brentwood Academy v. Tennessee School Athletic Ass'n*, 531 U.S. 288, 295–96, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001) (*"Brentwood Academy"*). Not surprisingly, therefore, "there is no single test to identify state actions and state actors." *Id.* at 294, 121 S.Ct. 924. Rather, there are "a host of facts that can bear on the fairness of . . . an attribution" of a challenged action to the State. *Id.* at 296, 121 S.Ct. 924.

State action may be found in situations where an activity that traditionally has been the exclusive, or near exclusive, function of the State has been contracted out to a private entity. For example, only the State may legitimately imprison individuals as punishment for the commission of crimes. Acts of prison employees will therefore almost certainly be considered acts of the State whatever the terms of their employment. *See, e.g., West v. Atkins*, 487 U.S. 42, 54–57, 108 S.Ct. 2250,

101 L.Ed.2d 40 (1988) (negligent acts of private physician working under contract to provide medical care to inmates were state action). But it can hardly be said that the provision of library services is similarly a "traditionally exclusive public function." *American Mfrs. Mutual Ins. Co. v. Sullivan*, 526 U.S. 40, 55, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999). On the contrary, a private individual or enterprise certainly could provide library services to the citizens of the Town in just the same manner as Benjamin Franklin provided library services to the citizens of Philadelphia two hundred and fifty years ago. It cannot be said "that the operation of a library constitutes ... a function traditionally associated with sovereignty." *Hollenbaugh v. Carnegie Free Library, of Connellsville, Pa.*, 545 F.2d 382, 383 (3rd. Cir.1976).

Further, Horvath's argument in favor of a finding of state action focuses most heavily on the fact that the Library's budget is almost exclusively composed of public funds. It is almost self-evident that this weighs in favor of Horvath's claim, but the Supreme Court has cautioned that it is far from the case that a predominance of public funding is conclusive evidence of state action. In *Rendell–Baker v. Kohn*, a privately operated school for students with disciplinary problems was sued by various former employees over the circumstances of their discharges. Most of the school's students had their tuition paid by public school districts, and the school also received aid from various federal and state education agencies. For several years, therefore, public funds accounted for more than ninety percent of the school's operating budget. In short, public entities were by far the school's biggest customer and source of funds. 457 U.S. at 831, 834–35, 102 S.Ct. 2764.

The Supreme Court held, however, that the school was not a state actor, at least for the purposes of the petitioners' claims. The decisive factor in the Court's view was that the school's personnel decisions were uninfluenced by public officials and that "the decisions to discharge the petitioners were not compelled or even influenced by any state regulation." 457 U.S. at 841, 102 S.Ct. 2764. In light of the autonomy with which it made its decisions as to whom to hire and fire, the school was not "fundamentally different from many private corporations whose business depends primarily on contracts to build roads, bridges, dams, ships, or submarines for the government. Acts of such private contractors do not become acts of the government by reason of their significant or even total engagement in performing public contracts." *Id.* at 840–41, 102 S.Ct. 2764.

Thus, it is plain that the Library is not a state actor by virtue of public funding alone. But we do not believe that *Rendell–Baker* controls this case, because it is also plain that the Library is not merely a private contractor whose internal management decisions are beyond state regulation. Nor is the Library merely an entity that has the State for its biggest customer. Rather, as noted above, the Library is governed by a Board of Trustees, half of whose members are appointed by the Town. The significance of this fact in the state action inquiry is most extensively set forth in *Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374, 115 S.Ct. 961, 130 L.Ed.2d 902 (1995), a case not cited by either of the parties.

In *Lebron*, the Supreme Court considered the state actor status of the National Railroad Passenger Corporation, commonly known as Amtrak. Amtrak was established by a Congressional statute, which explicitly states that it " 'will not be an agency or establishment of the United States Government.' " 513 U.S. at 391, 115 S.Ct. 961 (quoting Railroad Passenger

Service Act of 1970, 84 Stat. 1330). This designation, however, was held to be anything but conclusive because "it is not for Congress to make the final determination of Amtrak's status as a Government entity for purposes of determining the constitutional rights of citizens affected by its actions." *Id.* at 392, 115 S.Ct. 961. Rather, the Court looked to the fact that the statute creating Amtrak also "provide[d] for a board of nine members, six of whom [were] appointed directly by the President of the United States." *Id.* at 385, 115 S.Ct. 961. Two other members of the board are appointed by Amtrak's preferred shareholders, and the final member was appointed by the other eight members. *Id.* The Court concluded that "where ... the Government creates a corporation by special law, for the furtherance of government objectives, and retains for itself permanent authority to appoint a majority of the directors of that corporation," the corporation would be considered a state actor. *Id.* at 400, 115 S.Ct. 961.

Following *Lebron*, we have utilized the following standard to determine whether or not a corporate entity qualifies as a state actor: "only if (1) the government created the corporate entity by special law, (2) the government created the entity to further governmental objectives, and (3) the government retains 'permanent authority to appoint a majority the directors of the corporation' will the corporation be deemed a government entity for the purpose of the state action requirement." *Hack v. President & Fellows of Yale Coll.,* 237 F.3d 81, 84 (2d Cir.2000) (quoting *Lebron,* 513 U.S. at 400, 115 S.Ct. 961). In *Hack,* we considered whether Yale qualified as a state actor. Although we found that the first two elements of the *Lebron* standard were "easily satisfied," the fact that the State of Connecticut retained the right to appoint only two of Yale's nineteen board members meant that the school was

"a long way from [being] control[led]" by the state. *Id.; see also Hall v. American Nat'l Red Cross,* 86 F.3d 919, 921–22 (9th Cir.1996) (holding that the Red Cross was not a state actor where only eight of fifty members of its governing board were government appointees).

Here we believe that the *Lebron* standard has been satisfied. It is plain that the first two elements are present; as noted above, the Library was created by a special act of the Connecticut State legislature and there is no doubt that the provision of library services is a legitimate statutory objective. As to the third element, it is correct that only one-half, and not a majority, of the Library's trustees are appointed by the Town. However, we do not believe that this precludes a finding that the third element of *Lebron* has been satisfied. *See, e.g., Gorman–Bakos v. Cornell Coop. Extension of Schenectady County,* 252 F.3d 545, 552–53 (2d Cir.2001) (stating in dicta that State-created and funded agricultural cooperative was a state actor even though only two of its ten board members were government officials); *Becker v. Gallaudet Univ.,* 66 F.Supp.2d 16, 21 n. 6 (D.D.C.1999) (failure to fully satisfy third prong of standard should not preclude a finding of state action if the actual degree of public control is substantial). The additional fact that only a little more than a tenth of the Library's funding comes from sources other than the Town convinces us that the Town maintains sufficient control over the Library to qualify it as a state actor for the purposes of Horvath's claim. Thus, we conclude that the argument that the Library is a private entity "is overborne by the pervasive entwinement of public institutions and public officials in its composition and workings, and there is no substantial reason to claim unfairness in applying constitutional stan-

dards to it." *Brentwood Academy*, 531 U.S. at 289, 121 S.Ct. 924.

Two arguments to the contrary do not persuade us. The Library urges that the decision to terminate Horvath was made solely by the Library's Director who, although appointed by the trustees, is not herself a public official. This is significant because a finding of state action must be premised upon the fact that "the State is *responsible* for the *specific conduct* of which the plaintiff complains." *Blum v. Yaretsky*, 457 U.S. 991, 1004, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982) (first emphasis in original; second emphasis added). In *Brentwood Academy*, however, the Supreme Court has cautioned that the concept of responsibility is not to be read narrowly in the context of the state action inquiry. That is, the State need not have coerced or even encouraged the events at issue in the plaintiff's complaint if "the relevant facts show pervasive entwinement to the point of largely overlapping identity" between the State and the entity that the plaintiff contends is a state actor. 531 U.S. at 303, 121 S.Ct. 924; *see also St. Ledger v. Area Co-op. Educ. Servs.*, 228 F.Supp.2d 66, 72 (D.Conn.2002) (holding that pervasive entwinement with the State made educational center "a state entity for all purposes"); *accord Jenkins v. Area Coop. Educ. Servs.*, 248 F.Supp.2d 117, 123 (D.Conn.2003). The combination of pervasive public funding of the Library and control of one-half of its governing board persuade us that such "pervasive entwinement" is present here.

We also note that none of the trustees appointed by the Town to the Library's board at the time of Horvath's discharge were themselves public officials. But this fact certainly does not preclude a finding of state action because, pursuant to *Lebron*, it is the Town's "authority to appoint" trustees, and not the identity of the trustees appointed, that is relevant to the state action inquiry. 531 U.S. at 400, 121 S.Ct. 955.[1]

## CONCLUSION

For the forgoing reasons, we reverse the district court's grant of summary judgment. We note that the district court's holding was limited to a finding that the Library was not a state actor for the purposes of Horvath's Section 1983 claim, and that the court made no factual findings regarding Horvath's assertion that she was denied notice and an opportunity to be heard prior to her discharge. Our decision is similarly limited to the question of the Library's status as a state actor, and we express no opinion as to whether the Library satisfied the requirements of due process when it terminated Horvath.

---

**1.** The district court placed some reliance upon *Gilliard v. New York Public Library System*, 597 F.Supp. 1069 (S.D.N.Y.1984), and the defendants urge that the case is "[t]he only precedent in this Circuit regarding the status of a public library for section 1983 purposes." In *Gilliard*, a Section 1983 claim by a discharged employee of the New York Public Library was dismissed because the library was held not to be a state actor. *Id.* at 1075. The plaintiff in that case, however, relied upon nothing but the "bare allegation," pled upon information and belief, that the New York Public Library was supported by public funds. *Id.* at 1074. In our case, the defendants themselves have provided evidence of the Town's status as the major source of the Library's funds, and of the Town's power to appoint half of the Library's governing board.