Cooper v. U.S. Postal Service

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2008

(Argued: March 20, 2009          Decided: August 20, 2009)

Docket No. 07-4825-cv (L); 07-4826-cv (Con)

- - - - - - - - - - - - - - - - - - - -X

BERTRAM COOPER,
          Plaintiff-Appellee,

          -v.-                                        07-4825-cv
                                                      07-4826-cv
U.S. POSTAL SERVICE, JOHN E. POTTER,
as Postmaster General, RONALD G.
BOYNE, as Postmaster, Manchester,
Connecticut Post Office,
          Defendants-Appellants,

FULL GOSPEL INTERDENOMINATIONAL
CHURCH INC., DR. PHILIP SAUNDERS
HERITAGE ASSOCIATION, INC., SINCERELY
YOURS INC.,
          Intervenors-Defendants-
          Appellants,

GARY CHIPMAN, KIMON KARATH, LESLIE
STRONG,
          Intervenors.

- - - - - - - - - - - - - - - - - - - - -X

Before:      JACOBS, Chief Judge, WESLEY, Circuit Judge,

and CROTTY, District Judge.[*]

This case raises an Establishment Clause challenge to religious displays in a contract postal unit operated by a church in Manchester, Connecticut.  Contract postal units, or "CPUs," are postal facilities operated by private entities on private property (such as general stores or private homes) pursuant to contracts with the United States Postal Service.  Plaintiff Bertram Cooper, a Manchester resident, sued the United States Postal Service, the Postmaster General, and the Postmaster of Manchester, for declaratory and injunctive relief alleging discomfort with encountering religious materials displayed at the Manchester CPU.  The Full Gospel Interdenominational Church, which operates the CPU pursuant to a revenue-sharing contract with the government, intervened as a Defendant.  On cross-motions for summary judgment, the district judge concluded that (i) the CPU is a state actor, (ii) the contractual relationship between the government and the Church is permissible under the Establishment Clause, and (iii) the religious displays at the CPU violated the Establishment Clause.  Accordingly,

[*]  The Honorable Paul A. Crotty of the United States District Court for the Southern District of New York, sitting by designation.

the district court ordered removal of the religious displays.  Relief was stayed pending this appeal.

We conclude that Cooper had standing to raise the Establishment Clause challenge and that an Establishment Clause violation occurred, but as to relief, we require no more than that the postal counter be free of religious material, and that visual cues distinguish the space operating as a postal facility from the space functioning as purely private property.  We vacate the judgment of the district court and remand for further proceedings consistent with this opinion.

JEFFREY A. SHAFER, Benjamin W. Bull, Jordan W. Lorence, Matthew S. Bowman, Alliance Defense Fund, Washington, D.C., Joseph P. Secola, Secola Law Offices, Brookfield, Connecticut, for Appellant.

AARON S. BAYER, Kevin M. Smith, Alex J. Glage, Wiggin and Dana LLP, New Haven, Connecticut, Daniel Mach, American Civil Liberties Union Foundation, Washington, D.C., David McGuire, Connecticut Civil Liberties Union Foundation, Hartford, Connecticut, for Appellees.

Murad Hussain, Ronald L. Johnston, Arnold & Porter LLP, Los Angeles, California, Ayesha N. Khan, Alex J. Luchenitser,

Americans United for Separation of Church and State, for Amicus Curiae Americans United for Separation of Church and State.

Jeffrey I. Pasek, Cozen O'Connor, New York, New York, Theodore R. Mann, Jewish Social Policy Action Network, Philadelphia, Pennsylvania, for Amicus Curiae Jewish Social Policy Action Network.

Steven M. Freeman, Steven C. Sheinberg, Anti-Defamation League, New York, New York, for Amicus Curiae Anti-Defamation League.

DENNIS JACOBS, Chief Judge:

This case raises an Establishment Clause challenge to religious displays at a contract postal unit operated by a church in Manchester, Connecticut. Contract postal units, or "CPUs," are postal facilities operated by private entities on private property (such as general stores or private homes) pursuant to contracts with the United States Postal Service. Plaintiff Bertram Cooper ("Cooper"), a Manchester resident, alleged discomfort with encountering religious materials displayed at the Manchester CPU and sued the United States Postal Service ("USPS"), the Postmaster General of the United States (John E. Potter ("Potter")),

4

and the Postmaster of Manchester, Connecticut (Ronald G. Boyne ("Boyne")) for declaratory and injunctive relief. The Full Gospel Interdenominational Church (the "Church"), which operates the CPU pursuant to a revenue-sharing contract with the United States government, intervened as a Defendant.[1] The Manchester CPU is a purpose-built storefront with postal facilities on one side and the Church's outreach and ministry efforts on the other, with some spillover.

On cross-motions for summary judgment, the district judge initially decided that the religious displays at the CPU violated the Establishment Clause, ordered removal of the religious displays from the premises, and issued a permanent injunction preventing the Church--and proprietors of other CPUs--from displaying religious materials in contract postal units. On a motion to amend the judgment, the district court concluded that Cooper lacked standing to challenge Postal Service policies as to other CPUs and the decision was amended to apply only to the Manchester CPU.

---

[1] The term "Church" refers collectively to the intervenor-defendants who consist of: (1) the Full Gospel Interdenominational Church; (2) the "Dr. Phillip Saunders Heritage Association" (a Connecticut not-for-profit created by the Church to hold and manage its real estate); and (3) Sincerely Yours, Inc. (the not-for-profit entity incorporated to operate the CPU).

The injunction is stayed pending this appeal.

On appeal, the Church argues that the grant of partial summary judgment to Cooper was error because the displays: (i) were erected without involvement or encouragement by the USPS, (ii) do not violate regulations governing the appearance of CPUs, and (iii) constitute private speech.

Cooper, in turn, contends that the CPU is a state actor because (i) the USPS delegated to it an exclusively public function and (ii) the extensive and detailed contracts which accompany participation in the CPU program sufficiently involve the state in the CPU's activities. Cooper argues that as state action, the religious displays violate the Establishment Clause. Cooper stopped using the CPU when he entered a nursing home, but the suit has continued on behalf of three intervenors who are similarly aggrieved.

We now affirm in part and reverse in part. We conclude that Cooper had standing to raise an Establishment Clause challenge and that an Establishment Clause violation occurred at the Manchester CPU, but that any such violation is limited to the area of the CPU performing the public function; all other areas of the CPU remain the province of the private entity. Accordingly, by way of remedy, we

require that the postal counter be free of religious material, and that visual cues distinguish the space operating as a postal facility from the space functioning as the private property of the Church.

I

**(A) The Post Office**

Article I, Section 8 of the Constitution provides that "Congress shall have power . . . [t]o establish Post Offices and post Roads." Congress has delegated the power to create Post Offices to the USPS, 39 U.S.C. § 404(a)(3), awarded the USPS a monopoly over the carriage of letter mail, see Private Express Statutes, 18 U.S.C. §§ 1693-1699; Air Courier Conf. of Am. v. Am. Postal Workers Union AFL-CIO, 498 U.S. 517, 519 (1991), and forbidden the establishment of post offices without authority from the Postal Service, 18 U.S.C. § 1729.[2] Congress has also directed the Postal Service to "serve as nearly as practicable the entire population of the United States." 39 U.S.C. § 403(a). That

---

[2] Services like UPS and Federal Express operate pursuant to an exception to the monopoly which allows private carriers to provide services for "extremely urgent letters." See 39 C.F.R. § 320.6.

directive includes "establish[ing] and maintain[ing] postal facilities of such character and in such locations, that postal patrons throughout the Nation will, consistent with reasonable economies of postal operations, have ready access to essential postal services."  39 U.S.C. § 403(b)(3).  This entails "a maximum degree of effective and regular postal services to rural areas, communities, and small towns [even] where post offices are not self-sustaining."  39 U.S.C. § 101(b).

**(B) CPUs**

In order to comply with the Congressional mandate, the USPS uses both traditional post offices (or "classified" post offices) as well as CPUs, postal facilities operated by private parties on private property pursuant to revenue-sharing contracts with the government.  The CPUs furnish postal services to places where it is not otherwise geographically or economically feasible to build and operate official "classified" post offices.  Originally called "contract stations," CPUs have been used by the Postal

8

Service since the 1880s.[3]

The "Glossary of Postal Terms" defines a CPU as:

> A postal unit that is a subordinate unit within the service area of a main post office. It is usually located in a store or place of business and is operated by a contractor who accepts mail from the public, sells postage and supplies, and provides selected special services (for example, postal money order or registered mail). . . .

United States Postal Service Glossary of Postal Terms, Publication 32, May 1997 (Updated With Revisions Through July 5, 2007) at 27.[4] Five thousand CPUs across the country are in locations as diverse as private homes, gas stations, seminaries, groceries, gift shops, and hardware stores. See Defendants' Statement Pursuant to Local Rule 56 of the Southern District of New York ("Local Rule 56(a)1 Statement"), ¶ 6, December 27, 2004; Postal Accountability and Enhancement Act § 302 Network Plan, June 2008, at 42-43.[5] Several are operated by faith-based entities. See

---

[3] See USPS Postal History, Post Offices and Facilities, Stations and Branches, available at: http://www.usps.com/postalhistory/_rtf/StationsBranches.rtf.

[4] The Glossary is available at: http://www.usps.com/cpim/ftp/pubs/pub32.pdf

[5] The Network Plan is available at: http://www.usps.com/postallaw/_pdf/PostalServiceNetworkPlan.pdf#search='post offices cpu'.

Defendants' Local Rule 56(a)1 Statement, ¶ 16.

**(C) Postal Regulations**

According to postal regulations, a CPU "must not be located in, or directly connected to, a room where intoxicating beverages are sold for consumption on the premises." Standard Operating Procedures for Contract Postal Units. Beyond that, instruction is provided by the Contract Postal Unit Operations Guide, a training and operations manual for proprietors of CPUs:

> The appearance of your [CPU] reflects not only on you as a businessperson, but also on the Postal Service. Your unit should be organized and clean, conveying a professional image to your customers. It is very important to the success of your unit that our customers can recognize you as an official United States Post Office contract unit. The Postal Service has dedicated exterior and interior signage that will help you establish this identity.

CPUs are regulated by these few guidelines, which are mainly words of encouragement. Classified post offices, on the other hand, are governed by exacting regulations. Among them are limitations on the presence of religious displays, messages and symbols. For example, the Postal Operations

10

Manual ("POM") provides that "[e]xcept for official postal and other governmental notices and announcements, no handbills, flyers, pamphlets, signs, posters, placards, or other literature may be deposited on the grounds, walks, driveways, parking and maneuvering areas; exteriors of buildings and other structures; or on the floors, walks, stairs, racks, counters, desks, writing tables, window ledges, or furnishings in interior public areas on postal premises [of classified post offices]."  POM § 124.55.[6] "Bulletin boards and other posting space in Post Office lobbies and other public access areas may not be used for posting or display of . . . [r]eligious symbols . . . ." Id.  Seasonal holiday displays are tightly regulated (as set out in the margin[7]).  No such regulations govern CPUs.

---

[6]  This section of the POM is available at:
http://www.nalc.org/depart/cau/pdf/manuals/POM/pomc1.pdf.

[7]                    a. [Seasonal] Displays should relate to the business of the Postal Service, such as promoting the use of postal products and services and encouraging customers to send greetings and gifts.

b. The Postal Service must avoid the appearance of favoring any particular religion or religion itself.

c. Symbols identified with a particular religion, including but not limited to nativity scenes, crosses, or the Star of

**(D) The Manchester CPU**

For more than 15 years, the Postal Service has relied on CPUs to supplement postal service in Manchester, Connecticut.  Prior to 2001, the CPU was located in the "Community Place," an outreach organization.  When Community Place suspended operation in 2001, the USPS solicited bids.  There were two bidders: Manchester Hardware, Inc., and the Full Gospel Interdenominational Church.  The Postal Service assigned scores to each based on location, premises, and ability to provide services.  The Church earned a suitability score of "97" to Manchester Hardware's "91," and the CPU contract was awarded to the Church on November 21, 2001.  The Church then incorporated a not-for-profit business, Sincerely Yours, Inc. ("SYI"), for the purpose of operating the CPU.  The sole business of SYI is the operation of the CPU; other than offering USPS products and services, it serves no commercial function.

------

David, shall not be displayed on postal property. . . .

d. Printed expressions "Season's Greetings" and "Happy Holidays" should be used in lieu of "Merry Christmas" or "Happy Hannukkah."

POM § 124.57 (emphasis added); see also POM § 124.56.

The standard CPU contract requires that "all Contract Postal Units . . . reflect a uniform image." For example, the contract specifies that "[a]mbient lighting shall be at least 80 footcandles anywhere at the service and/or work counter areas," and individual CPU owners/entities must "[c]learly indicate any [and] all deviations from [the] noted . . . requirements on submitted drawings/documents so they may be evaluated along with the balance of the proposal." In order to achieve the desired "uniform image," the USPS--per the CPU contract--agrees to pay for (among other things) the construction of postal service counters and other build-out requirements, all according to detailed specifications. The USPS paid for the construction of such items at SYI.

All money collected at the CPU is the property of the Postal Service, and SYI is paid for its share of contractual earnings at the end of the relevant accounting period: 18% of sales of USPS products and services, and 33% of post office box rental fees. Employees of SYI are trained by the USPS, and "must be professionally attired, wear name tags, and project a favorable image of the supplier as the operator of the Contract Postal Unit," but SYI retains the

13

authority to hire and fire all SYI employees.

The USPS "reserves the right, without prior notice, to conduct audits and customer surveys and to review and inspect the supplier's performance and the quality of service at any time during the operating hours of the [CPU]." The USPS also appoints a "Contracting Officer's Representative" (or "COR") as a liaison between the USPS and the CPU, to ensure compliance with the CPU contract and governing regulations, and to provide general oversight. Defendant Ronald Boyne--the Manchester Postmaster (and a Church member)--was appointed to this position at SYI. At his deposition, he testified that one of his responsibilities was to ensure that SYI projected a "positive image" of the USPS and complied with all postal regulations. When asked to name items which would not present a "positive image" or were not permitted to be displayed or sold in a CPU, Boyne replied that through his COR training he learned that only two items were prohibited by regulation: alcohol and pornography.

As for the displays at the CPU, the contract states that SYI "will be posting advertisements for local non-profit community outreach agencies such as MARC, Inc., Heart

14

Association, Flu Clinics, Cancer Agencies, etc." Religious displays are not mentioned.

SYI opened in June 2002. It is located on Main Street in Manchester and is marked with various signs identifying it as the "Sincerely Yours, Inc. Contract Postal Unit." The exterior of the building (which faces the street) has one such sign along with the familiar eagle logo of the Postal Service.

The interior of the CPU contains (among other things) a postal counter manned by SYI employees, a waiting area for customers, post office boxes, and a shelving unit containing official USPS postal supplies, paperwork, and mailing boxes. SYI offers a variety of postal services including Express, Priority, and First Class domestic mail; international mail; insurance, certification, and delivery confirmation services; Post Office Box rentals; and sales of stamps, stationery, and other packaging products. The prices for these products and services are set by the USPS.

**(E) The Religious Displays**

Also located in the CPU are religious materials: displays informing customers about prayer requests; prayer

15

cards; a box--located on the postal counter--into which postal service customers can deposit prayer requests; a framed advertisement for "World-Wide Lighthouse Missions" (the missionary organization to which the SYI CPU's profits are donated); a donation box for the World-Wide organization; pamphlets and flyers advertising the mission, which include biblical passages and religious messages; a World-Wide Lighthouse Missions donation jar on the postal counter; a television monitor displaying Church-related videos on one side of the postal counter; various 8 1/2" x 14" photographs of Church events; and pictures of "Wally"--a cartoon character who conveys religious messages.

A sign in the middle of the postal counter bears the official USPS logo and a disclaimer:

> The United States Postal Service does not endorse the religious viewpoint expressed in the materials posted at this Contract Postal Unit.

**(F) Cooper's Objections to the CPU**

Plaintiff Bertram Cooper is a 77-year-old (former) resident of Manchester, Connecticut.[8]  Cooper used the SYI

---

[8]  While this appeal was pending, Mr. Cooper moved out of Manchester and into a nursing home in West Hartford, Connecticut.  Because the move created potential

CPU because it was closer to his home than the next available post office. As Cooper's affidavit recounts, the religious displays at SYI made him "very uncomfortable," and when he registered a complaint, he "was told that [he] could go somewhere else if [he didn't] like it." The complaint alleges that he "reasonably perceive[d] SYI's religious expression to be governmentally-sponsored and supported religious activity."

**(G) The Lawsuit**

Cooper filed his complaint on October 3, 2003, seeking declaratory and injunctive relief against the USPS, the Postmaster General, and the Postmaster of Manchester, Connecticut. The Church intervened as a defendant. The district court's Memorandum and Order deciding the parties' cross-motions for summary judgment (issued April 18, 2007), concluded that:

> (1) for the purposes of First Amendment and Establishment Clause jurisprudence, the SYI CPU is a state actor;

jurisdictional problems, this Court's June 18, 2008 order allowed other Manchester residents to intervene as appellees. They are Gary Chipman, Kimon Karath, and Leslie Strong.

17

(2) the contractual relationship between the USPS and the Church does not violate the Establishment Clause; and

(3) the religious displays at the SYI CPU violate the Establishment Clause.

Initially, the District Court granted Cooper's request for a declaratory judgment covering all CPUs nationwide:

To the extent that [SYI], and all other individuals or entities, in the course of operating [CPUs] . . . act in a manner that proselytizes or advances religion, including, but not limited to, the posting of religious displays that proselytize or advance religion, such conduct violates the First Amendment to the United States Constitution.

On Cooper's request for an injunction, the district court directed that: (i) SYI remove all religious displays and "cease from acting in a manner that proselytizes or advances religion;" (ii) the USPS provide notice to all CPUs that "they shall not act in a manner that proselytizes or advances religion"; and (iii) the USPS institute adequate monitoring procedures to ensure compliance with the order.

Both the Postal Service and the Church moved to alter or amend the judgment. By order dated August 28, 2007, the district court rejected the Church's offer to cure the Establishment Clause violation by removing the two large signs and one small sign containing the words "United States

18

Post Office," and by adding a sign indicating that SYI was a "private entity."

The Postal Service argued that the findings were insufficient to support relief against the USPS generally and to any CPU other than SYI. The district court amended its decision, commenting that it could "find[] nothing in the record indicating the Plaintiff has suffered a concrete and particularized injury that is either actual or imminent at any CPU other than the SYI CPU." The relief was narrowed accordingly.

All Defendants appealed, but the USPS dropped out, leaving the Church alone as Appellant.

**II**

Article III of the Constitution limits the judicial power of the United States to the resolution of cases and controversies. U.S. Const. art. III, § 2. This limitation is effectuated through the requirement of standing. <u>Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.</u> ("<u>Valley Forge</u>"), 454 U.S. 464, 471-72 (1982). "The question of standing is not subject to waiver . . . : 'We are required to address the issue even if

19

the courts below have not passed on it, and even if the parties fail to raise the issue before us.'" United States v. Hays, 515 U.S. 737, 742 (1995) (quoting FW/PBS, Inc. v. Dallas, 493 U.S. 215, 230-31 (1990)). It is axiomatic that "[t]here are three Article III standing requirements: (1) the plaintiff must have suffered an injury-in-fact; (2) there must be a causal connection between the injury and the conduct at issue; and (3) the injury must be likely to be redressed by a favorable decision." Kendall v. Employees Ret. Plan of Avon Prods., 561 F.3d 112, 118 (2d Cir. 2009). The injury requirement is the linchpin in Establishment Clause cases: "[A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant.'" Valley Forge, 454 U.S. at 472 (quoting Gladstone, Realtors v. Vill. of Bellwood, 441 U.S. 91, 99 (1979)). A demonstration of a "generalized grievance" is insufficient; the plaintiff must demonstrate a "'distinct and palpable injury' . . . that is likely to be redressed if the requested relief is granted." Id. at 475 (quoting Gladstone, 441 U.S. at 100).

20

Standing is often a tough question in the Establishment Clause context, where the injuries alleged are to the feelings alone.[9]  This is often the case in religious display cases where the fact of exposure becomes the basis for injury and jurisdiction.  As the Eighth Circuit has observed, "[n]o governing precedent describes the injury in fact required to establish standing in a religious display case . . . ."  ACLU Nebraska Found. v. City of Plattsmouth, 358 F.3d 1020, 1028 (8th Cir. 2004).

Several times, the Supreme Court has considered the problem of standing in the Establishment Clause context, but so far the Court has announced no reliable and handy principles of analysis.  For example, in Valley Forge, the Supreme Court concluded that plaintiffs lacked standing to bring their Establishment Clause claim challenging the conveyance, at no cost, of 77 acres of federal property to a Christian college.  The Third Circuit had earlier concluded that the challengers "had standing merely as 'citizens,'

---

[9]  A broad swath of litigants can demonstrate standing under Flast v. Cohen, 392 U.S. 83 (1968), which permits litigants to raise claims on the ground that their "tax money is being extracted and spent in violation of specific constitutional protections."  Id. at 106.  The issue is far more difficult where, as here, the alleged injuries are non-economic and taxpayer status is not the basis for jurisdiction.

21

claiming 'injury in fact' to their shared individuated right to a government that 'shall make no law respecting the establishment of religion.'"  454 U.S. at 470 (quoting 619 F.2d 252, 261 (3d Cir. 1980)).  But the Supreme Court reversed because:

> They fail[ed] to identify any personal injury suffered by them as a consequence of the alleged constitutional error, other than the psychological consequence presumably produced by observation of conduct with which one disagrees.  That is not an injury sufficient to confer standing under Art. III, even though the disagreement is phrased in constitutional terms.  It is evident that respondents are firmly committed to the constitutional principle of separation of church and State, but standing is not measured by the intensity of the litigant's interest or the fervor of his advocacy.  That concrete adverseness which sharpens the presentation of issues, is the anticipated consequence of proceedings commenced by one who has been injured in fact; it is not a permissible substitute for the showing of injury itself.

Valley Forge, 454 U.S. at 485-86 (quotations, citation, and emphasis omitted).  This passage explains what standing is not, without saying what standing is in these kinds of cases.  Lower courts are left to find a threshold for injury and determine somewhat arbitrarily whether that threshold has been reached.  Chief Justice Rehnquist recognized that

22

the question of standing in the Establishment Clause context is vexed: "[T]here are serious arguments on both sides of this question, the Courts of Appeals have divided on the issue, and the issue determines the reach of federal courts' power of judicial review of state actions." City of Edmond v. Robinson, 517 U.S. 1201, 1203 (1996) (dissenting in the denial of certiorari; joined by Justices Scalia and Thomas). In short, there is uncertainty concerning how to apply the injury in fact requirement in the Establishment Clause context.

Cooper alleged that the discomfort he suffered when he viewed the religious displays at SYI was so great that he was inclined to drive to another postal unit. The initial question is whether that amounts to a sufficiently "distinct and palpable" injury for standing purposes. Our leading case on Establishment Clause standing is Sullivan v. Syracuse Housing Authority, 962 F.2d 1101 (2d Cir. 1992), in which the Syracuse Housing Authority (the "Authority") contracted for a faith-based entity to operate a religious after-school program in the community center of the public housing development where the plaintiff lived. The district court dismissed the case for lack of standing, but the

23

Second Circuit found a cognizable "spiritual First Amendment injury" and reversed. Id. at 1108. The touchstone of the analysis was whether Sullivan had a "direct and personal stake" in the controversy. Id. Relying on Sierra Club v. Morton, 405 U.S. 727 (1972), and Valley Forge, we concluded that the Authority's conduct deprived Sullivan of his right to use and enjoy the community center, that Sullivan "[found] the alleged establishment of religion offensive," and that the Authority's actions essentially established religion "in a place functionally analogous to Sullivan's own home." Sullivan, 962 F.2d at 1108.[10] Under those circumstances, Sullivan's allegations amounted to a sufficiently "direct and personal stake" in the dispute to confer standing, and the case was reinstated and remanded to the district court.

Applying Sullivan, we must conclude that Cooper has alleged a sufficiently "direct and personal stake" in the controversy to confer standing. Cooper claims that he was made uncomfortable by direct contact with religious displays

_____

[10] Separately, the Circuit also concluded that Sullivan's status as a parent whose child had been taught religious songs in the after-school program gave him an additional, independent ground sufficient to support standing. Sullivan, 962 F.2d at 1109.

24

that were made a part of his experience using the postal facility nearest his home, and that upon complaint, he was advised to alter his behavior. Under Sullivan, these allegations state an injury in fact sufficient to support standing.

**III**

(A) State Action

The Due Process Clause of the Fourteenth Amendment provides: "[N]or shall any State deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. By its terms, "private action is immune from the restrictions of the Fourteenth Amendment," and the Amendment "offers no shield" against private conduct, "'however discriminatory or wrongful.'" Jackson v. Metro. Edison Co., 419 U.S. 345, 349 (1974) (quoting Shelley v. Kraemer, 334 U.S. 1, 13 (1948)). The Amendment applies only to state action. Id.; see also Civil Rights Cases, 109 U.S. 3 (1883). The Fourteenth Amendment, in turn, incorporates the First Amendment, so "[t]he Fourteenth Amendment, and, through it, the First . . . Amendment[], do not apply to private parties unless those parties are

25

engaged in activity deemed to be 'state action.'" Nat'l Broad. Co., Inc. v. Commc'ns Workers of Am., AFL-CIO, 860 F.2d 1022, 1024 (11th Cir. 1988).

"Actions of a private entity are attributable to the State if 'there is a sufficiently close nexus between the State and the challenged action of the . . . entity so that the action of the latter may be fairly treated as that of the State itself.'" United States v. Stein, 541 F.3d 130, 146 (2d Cir. 2008) (quoting Jackson, 419 U.S. at 351). The "close nexus" test "'assure[s] that constitutional standards are invoked only when it can be said that the State is responsible for the specific conduct of which the plaintiff complains.'" Id. at 146-47 (quoting Blum v. Yaretsky, 457 U.S. 991, 1004 (1982)). However, "Supreme Court cases on this issue 'have not been a model of consistency.'" Id. at 147 (quoting Edmonson v. Leesville Concrete Co., 500 U.S. 614, 632 (1991) (O'Connor, J., dissenting)). "Not surprisingly, therefore, there is no single test to identify state actions and state actors. Rather, there are a host of facts that can bear on the fairness of an attribution of a challenged action to the State." Horvath v. Westport Library Ass'n, 362 F.3d 147, 151 (2d Cir. 2004) (quotations

26

and citations omitted).

"A nexus of state action exists . . . when the state exercises coercive power, is entwined in the management or control of the private actor, . . . or when the private actor operates as a willful participant in joint activity with the State or its agents, is controlled by an agency of the State, has been delegated a public function by the state, or is entwined with governmental policies." Stein, 541 F.3d at 147 (quotations, citations, and emphases omitted). However, "conduct by a private entity is not fairly attributable to the state merely because the private entity is a business subject to extensive state regulation or 'affected with the public interest.'" Cranley v. Nat'l Life Ins. Co. of Vermont, 318 F.3d 105, 112 (2d Cir. 2003) (quoting Jackson, 419 U.S. at 350). "A finding of state action may not be premised solely on the private entity's creation, funding, licensing, or regulation by the government." Id.

### 1. Government Contracts

SYI's contract with the government does not convert its conduct into state action. The government

enters into contracts for all kinds of goods and services without converting its contractors into state actors; architects designing federal buildings or engineers building bridges do not thereby become government actors. See Rendell-Baker v. Kohn, 457 U.S. 830, 841 (1982) (the "[a]cts of . . . private contractors do not become acts of the government by reason of their significant or even total engagement in performing public contracts"). The fact that "a private entity performs a function which serves the public does not make its acts state action." Id. at 842. The contract itself is insufficient to render all of the contractor's conduct state action, and the CPU contract here is not enough by itself to make SYI a state actor. See id.

2. The "Public Function" Test

Since the contract alone does not convert the CPU into a state actor, we must explore whether and to what extent the CPU is a "state actor" while performing its contractual tasks. One way that a private entity may be considered a state actor for constitutional purposes is by "exercis[ing] powers that are 'traditionally the exclusive prerogative of the State.'" Blum v. Yaretsky, 457 U.S. 991,

28

1005 (1982) (quoting Jackson, 419 U.S. at 353).  "State action may be found in situations where an activity that traditionally has been the exclusive, or near exclusive, function of the State has been contracted out to a private entity.  For example, only the State may legitimately imprison individuals as punishment for the commission of crimes."  Horvath, 362 F.3d at 151.

In West v. Atkins, the Supreme Court concluded that the conduct of a private medical doctor attending to prison inmates pursuant to a government contract was "fairly attributable to the State" for the purposes of 42 U.S.C. § 1983.  487 U.S. 42, 57 (1988).[11]  The approach is functional:

> The fact that the State employed [the doctor] pursuant to a contractual arrangement that did not generate the same benefits or obligations applicable to other 'state employees' does not alter the [state action] analysis.  It is the physician's function within the state system, not the precise terms of his employment, that determines whether his actions can fairly be attributed to the State.

Id. at 55-56 (emphasis added).  State action analysis is

---

[11]  The inmate brought a § 1983 action against the doctor alleging an Eighth Amendment violation on the ground that the doctor failed to provide adequate treatment for an ankle injury.

thus guided by the nature of the services supplied.

SYI is a state actor under this public function test. Congress granted to the USPS the exclusive duty to create and operate Post Offices with responsibility to accept and process mail, sell postal products, and, of course, participate in the safe carriage of mail. See 39 U.S.C. § 404(a)(3). As to safe carriage, Congress has conferred to the Postal Service a complete monopoly. See, e.g., 18 U.S.C. § 1693. That monopoly entails the sale of postage for letters, acceptance of mail for transmission, and the marking and processing of mail for delivery: all functions performed by SYI and other CPUs. Accordingly, we conclude that SYI is a state actor under the public function test because it performs--at least in some parts of the facility--"activit[ies] that traditionally ha[ve] been the exclusive, or near exclusive, function of the State." Horvath, 362 F.3d at 151.

That is not to say, however, that all of SYI serves a public function, any more than selling shovels becomes a public function when a CPU is located in a hardware store. SYI is an independent, separate and distinct not-for-profit entity incorporated for the Church's private use and

30

purposes. The extent of state action correlates directly with the performance of the public function, which here is limited to those areas where the business of the CPU is conducted. This is so notwithstanding that signage at the portal identifies the shop (or home or seminary) as a place where federal postal services are rendered. In sum, SYI is a state actor pursuant to the public function test, but only as to those areas of its facility where the public function takes place, namely the postal counter, the postal boxes, and the shelving unit that stores and displays postal materials.

Having determined that at least part of SYI is operating as a state actor under the public function test, we consider whether that state action violated the Establishment Clause. We conclude that it does.

**IV**

The Establishment Clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. But the "Amendment contains no textual definition of 'establishment' and the term is certainly not self-defining." McCreary

County, Ky. v. ACLU of Ky., 545 U.S. 844, 874-75 (2005). "In the absence of precisely stated constitutional prohibitions, we must draw lines with reference to the three main evils against which the Establishment Clause was intended to afford protection: 'sponsorship, financial support, and active involvement of the sovereign in religious activity.'" Lemon v. Kurtzman, 403 U.S. 602, 612 (1971) (quoting Walz v. Tax Comm'n, 397 U.S. 664, 668 (1970)). One "'significant factor in upholding governmental programs in the face of Establishment Clause attack is their neutrality towards religion.'" Good News Club v. Milford Cent. School, 533 U.S. 98, 114 (2001) (quoting Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 839 (1995)). "'In distinguishing between indoctrination that is attributable to the State and indoctrination that is not, [the Court has] consistently turned to the principle of neutrality, upholding aid that is offered to a broad range of groups or persons without regard to their religion.'" Id. (quoting Mitchell v. Helms, 530 U.S. 793, 809 (2000) (plurality opinion)).

Did the presence of the religious displays here violate the Establishment Clause? It is clear that for certain

32

displays, in certain places, the government's "religious object is unmistakable" and a violation apparent. McCreary, 545 U.S. at 869. We conclude that an Establishment Clause violation occurred, but given the fact that the state action is limited to a part of the premises, the violation--and the remedy--are limited in the same way and to the same extent.

(A) The Government Contract

The Supreme Court "has never held that religious institutions are disabled by the First Amendment from participating in publicly sponsored social welfare programs." Bowen v. Kendrick, 487 U.S. 589, 609 (1988). "It long has been established . . . that the State may send a cleric . . . to perform a wholly secular task." Roemer v. Bd. of Pub. Works of Md., 426 U.S. 736, 746 (1976). The analysis is governed by the principle of neutrality: "the government may not favor one religion over another, or religion over irreligion, religious choice being the prerogative of individuals." McCreary, 545 U.S. at 875-76.

With respect to the CPU program, the government has espoused a neutral position: it will contract for CPU services with both religious and secular entities; and, as

33

to religious entities, the government makes no distinctions between faiths or sects. The fact that a CPU is located in a religious facility, or sponsored by a religious entity, or that its revenues benefit a particular faith, does not offend the Establishment Clause. Any violation must arise from the specific conditions of SYI's structure and space, and its religious displays.

(B) The Lemon Test

The primary means of evaluating an Establishment Clause challenge to a religious display remains the beleaguered Lemon test, articulated by the Supreme Court in Lemon v. Kurtzman, 403 U.S. 602 (1971). "Under [the] Lemon [test], government action that interacts with religion must: (1) have a secular purpose, (2) have a principal effect that neither advances nor inhibits religion, and (3) not bring about an excessive government entanglement with religion." Westchester Day School v. Vill. of Mamaroneck, 504 F.3d 338, 355 (2d Cir. 2007) (citing Lemon, 403 U.S. at 612-13); see also Agostini v. Felton, 521 U.S. 203, 218 (1997).

Both parties submit that the Lemon test is the appropriate test for evaluating the Establishment Clause

challenge here (and the District Court agreed), though a review of relevant case law demonstrates that Lemon is difficult to apply and not a particularly useful test in determining what is permissible under the Establishment Clause.[12]  Still, "it is not our role to provoke the Supreme Court into reconsidering its precedent by an aggressive (or fanciful) ruling on a vital subject."  Landell v. Sorrell, 406 F.3d 159, 177 (2d Cir. 2005) (Jacobs, J., dissenting from the denial of rehearing en banc).  Accordingly, we proceed to a straightforward application of the Lemon test.

---

[12]  In 2000, the Supreme Court denied certiorari in an Establishment Clause case, but Justice Scalia, joined by Chief Justice Rehnquist and Justice Thomas, dissented from the denial, expressing frustration with the Lemon test.  See Tangipahoa Parish Bd. of Educ. v. Freiler, 530 U.S. 1251 (2000) (Scalia, J., dissenting from the denial of certiorari) ("Like a majority of the Members of this Court, I have previously expressed my disapproval of the Lemon test.  I would grant certiorari in this case if only to take the opportunity to inter the Lemon test once for all.") (citations omitted).  Other Justices and courts have expressed similar frustrations.  See Comm. for Pub. Educ. & Religious Liberty v. Regan, 444 U.S. 646, 671 (1980) (Stevens, J., dissenting) (lamenting "the sisyphean task of trying to patch together the blurred, indistinct, and variable barrier described in Lemon v. Kurtzman") (quotations omitted); Roark v. S. Iron R-1 School Dist., --- F.3d ---, No. 08-1847, 2009 WL 2045683, at *4 (8th Cir. July 16, 2009) (observing that "the Lemon test has had a 'checkered career'") (quoting Van Orden v. Perry, 545 U.S. 677, 700 (2005)); Access Fund v. U.S. Dep't of Agric., 499 F.3d 1036, 1042 (9th Cir. 2007) ("We recognize that the Lemon test has hardly been sanctified by the Supreme Court.").

We first ask whether there is a secular purpose for displaying religious material on the postal counter. We cannot think of one. The express and admitted purpose of the religious material is to raise awareness for the mission sponsored by the Church and to spread the Church's Christian message. We have no trouble concluding that the displays on the postal counter soliciting prayer requests and advertising the mission express a distinctly religious purpose, and that they fail spectacularly under the first inquiry of Lemon. Having failed at the first juncture, there is no need to proceed further in the Lemon test, although it is no great stretch to say that the religious materials on the postal counter would also have a principal effect of advancing religion (and might arguably entangle the government excessively with religion). The religious displays on the postal counter clearly fail the Lemon test.

Nevertheless, the analysis is complicated by a disclaimer on the postal counter:

> The United States Postal Service does not endorse the religious viewpoint expressed in the materials posted at this Contract Postal Unit.

While the presence of this disclaimer informs our review, the precise impact of a disclaimer on Establishment Clause

analysis is not at all clear, and this Circuit has not directly addressed the issue.

Supreme Court jurisprudence on disclaimers is not determinative. In County of Allegheny v. ACLU, 492 U.S. 573 (1989), the Supreme Court reviewed the constitutionality of [i] a crèche inside of a courthouse, and [ii] a menorah and Christmas tree displayed outside of a city building. It was a split decision: the crèche was unconstitutional, but the menorah/Christmas tree display was not. The presence of a disclaimer, however, did not save the crèche:

> The fact that the crèche bears a sign disclosing its ownership by a Roman Catholic organization does not alter [the] conclusion [that the display violates the Establishment Clause]. On the contrary, the sign simply demonstrates that the government is endorsing the religious message of [the] organization . . . .

Id. at 600. However, in Rosenberger v. Rector and Visitors of Univ. of Va., 515 U.S. 819 (1995), the Supreme Court permitted the use of public university student-activity funds to print a newspaper for a religions student group. Justice O'Connor's concurrence took note of an "explicit disclaimer" as a justification for the outcome. Id. at 852 (O'Connor, J., concurring). The Ninth Circuit has likewise

37

noted that the perception of impermissible religious endorsement was "less likely . . . because of the [presence of] express disclaimers that [a religious] activity [was] not school-sponsored." Hills v. Scottsdale Unified School Dist. No. 48, 329 F.3d 1044, 1056 (9th Cir. 2003). "[A] disclaimer arguably distances [government] officials from 'sponsoring' [religious] speech . . . ." Lassonde v. Pleasanton Unified School Dist., 320 F.3d 979, 984 (9th Cir. 2003). The Sixth Circuit has also cited the presence of a disclaimer as a basis for permitting the display of a Latin cross in a public square during the Christmas season. Pinette v. Capitol Square Review & Advisory Bd., 30 F.3d 675, 679 (6th Cir. 1994) ("Of course, the display at issue here is not a government sponsored display; it is, in fact, privately funded and privately maintained, and carries an express disclaimer of any government support."). Id.

However useful the disclaimer is, the law does not unambiguously allow us to draw the conclusion that the disclaimer prevents or cures a violation.

**V**

As a general matter, federal courts have leeway to

38

fashion appropriate relief, and "[a]ppellate tribunals have accorded district courts broad discretion to frame equitable remedies [for constitutional violations] so long as the relief granted is commensurate with the scope of the constitutional infraction." Todaro v. Ward, 565 F.2d 48, 54 n.7 (2d Cir. 1977). Especially in the Establishment Clause context, courts must endeavor to craft remedies that correspond to the violations. See Bowen v. Kendrick, 487 U.S. 589, 620 (1988) ("The District Court . . . identif[ied] certain instances in which it felt [federal] funds were used for constitutionally improper purposes [under the Establishment Clause], but . . . the court did not adequately design its remedy to address the specific problems it found . . . ."); see also Mitchell v. Helms, 530 U.S. 793, 865 (2000) (O'Connor, J., concurring) ("[E]xtensive violations . . . will be highly relevant in shaping an appropriate remedy . . . . I know of no case in which we have declared an entire aid program unconstitutional on Establishment Clause grounds solely because of violations on [a] minuscule scale . . . .") (quotations and citations omitted).

Here, the district court ordered SYI to "remove . . .

any and all religious displays, prayer cards, advertisements, donation solicitations, and telecommunication videos or broadcasts that proselytize or advance the religion of the [Church]." The Postal Service was also directed to prohibit SYI from posting such materials as long as it was "in the course of operating the [CPU]." However, the removal of all religious messages would render the premises a single-use post office, and would prevent the second legitimate use to which the premises are dedicated. This remedy does not correspond to the scope of the violation and the resulting harm.

The gravamen of the complaint is that Mr. Cooper was made to feel that he was an unwilling participant in a faith not his own when he entered a space dedicated to two separate functions, only one of which was apparent from the outside. Ordinarily, when CPUs are housed in churches or synagogues or monasteries or mosques, customers are alerted to the facility's religious status by cues such as ecclesiastical architecture, schedules of religious services, and religious iconography or statuary. SYI gives no visual cues to alert its customers to its function as a Christian outreach facility. So a customer walking into SYI

40

might become bewildered as to whether a chapel has been made into a post office, or a post office has been made into a chapel.

The district court erred by extending the violation-- and then the remedy--to the entire facility. The Manchester CPU is _not_ a classified post office and need not be regulated as such, but the public function it performs is in tension with its (otherwise permissible) sectarian message. A direct, effective and complete remedy for the violation is one that limits the public function to designated public spaces and returns the remainder of the facility to SYI's private purposes. This can be accomplished short of frustrating either the postal function or the other lawful purposes which the Church pursues on the premises.

Since the extent of the state action (and the extent of the Establishment Clause violation) is limited to that part of the CPU fulfilling the Postal Service's mandated public function, a sufficient remedy need extend no further or elsewhere. Here, the public functions include the acceptance of mail, the processing of mail and packages for delivery, and the sale of postal goods and services. These are performed or fulfilled at the postal counter, in the

41

post office boxes, and on the shelving housing postal products; so the postal counter and the surfaces of the post office boxes and shelving units are zones in which the function of religious outreach is out of place. The postal counter, post office boxes and shelving units must therefore be free of prayer cards and messages and must be cleared of religious material. Since the disclaimer is helpful in differentiating the public space and function from the private one, it should remain.

In order to differentiate the primary area serving the public function from the remainder of the space operating as a private ministry, SYI is directed to create and install a barrier in front of the postal counter that is a visual cue and gives a sense of passage from one area of the space into another, thereby delineating space exclusively dedicated to the public function from space dedicated to other things. Separation and visual cues will not keep the video from being seen and overheard by postal patrons, but the source will unambiguously emanate from a zone distinct from the post office functions. We need not prescribe the specifications of the barrier, but it would do to use such things as stanchions with hanging ropes (of the kind used in

42

a theater), or a low railing.  Once the postal counter is cleared and visual cues installed, no more is required to cure the Establishment Clause violation.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is vacated and the case remanded for the creation of an injunction consistent with this opinion.