**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| JOHN WOOLARD; BREANNA WOOLARD; HECTOR GONZALES; DIANA GONZALES; CARRIE DODSON, | No. 24-4291 D.C. No. 2:23-cv-02305-JAM-JDP |
| *Plaintiffs - Appellants*, v. | |
| TONY THURMOND; MICHAEL COLEMAN; KRISTIN BLANCO; BARRY LINDAMAN; BREANN MORSE; TED DESTRAMPE; RENE ADAMO; MELISSA BASSANELLI; ZIMA CREASON; PAM COSTA; SAUL HERNANDEZ; BEN AVEY; PAULA VILLESCAZ; TANYA KRAVCHUK; BLUE RIDGE ACADEMY; SAMANTHA HAYNES; JESSIE MARON; VISIONS IN EDUCATION CHARTER SCHOOL; BRIAN ALBRIGHT; STEVE OLMOS; JENNIFER MORRISON; MICAH STUDER; MARK HOLMAN; LISA SOPHOS, | ORDER AND AMENDED OPINION |
| *Defendants - Appellees*. | |

Appeal from the United States District Court
for the Eastern District of California
John A. Mendez, District Judge, Presiding

Argued and Submitted June 4, 2025
Pasadena, California

Filed September 11, 2025
Amended March 23, 2026

Before: Andrew D. Hurwitz, Eric D. Miller, and Jennifer
Sung, Circuit Judges.

Opinion by Judge Hurwitz;
Dissent to Order by Judge Bumatay;
Dissent to Order by Judge VanDyke

## SUMMARY[*]

### First Amendment

The panel filed (1) an order amending the opinion filed September 11, 2025, denying a petition for rehearing en banc; and (2) an amended opinion affirming the district court's dismissal of a 42 U.S.C. § 1983 action brought by parents and guardians of students enrolled in independent study programs at two California charter schools who

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

alleged First Amendment violations when the schools rejected their requests to purchase and permit the use of sectarian curricular materials for instruction in the schools' programs.

The charter schools rejected the requests because California laws prohibit the teaching of sectarian or denominational doctrine in public schools, including charter schools. Plaintiffs allege that the rejection of their requests pursuant to those laws violates the Free Exercise and Free Speech Clauses of the First Amendment. They contend, among other things, that the charter schools' independent study programs are really in substance homeschooling, not public education, and that the schools' provision of curricular materials should be treated as a generally available public benefit in aid of homeschooling. Pursuant to recent Supreme Court authority, access to such public benefits cannot be denied based on plaintiffs' religious beliefs.

The panel first held that the extensive legal requirements applicable to the defendant charter schools' independent study programs make them public school programs and defeat plaintiffs' free exercise claim. The independent study programs at issue share the features of public education that the Supreme Court emphasized in *Carson v. Makin*, 596 U.S. 767, 785 (2022): the California charter schools operating independent study programs must be free to attend and accept all students for which they have capacity; the programs must be substantially equivalent to classroom-based instruction and aligned to relevant local and state content standards; and the programs must be coordinated and evaluated by, and under the general supervision of state-certified teachers.

The panel next rejected plaintiffs' claim that requiring parents to use state-approved materials in independent study programs that do not reflect their religious views is compelled speech in violation of the Free Speech Clause. The panel held that a public school's curriculum qualifies as government speech and therefore is not subject to scrutiny under the Free Speech Clause.

Dissenting from the denial of rehearing en banc, Judge Bumatay, joined by Judges R. Nelson, Collins, VanDyke, and Tung, wrote that the mere fact that the independent study program here is operated under the auspices of a charter school that is deemed to be part of the public school system does not transform that parent-focused program—in which parents teach their own children in their own home with the curricula they choose—into the equivalent of a "public school program." This should have been a straightforward ruling because the families challenging the independent study programs' exclusion of faith-based curricula easily alleged a free exercise violation. Both the initial and amended panel decisions misunderstand free exercise doctrine. By fixating on the "public school" label and ending its analysis, the panel ignored *Carson*'s warning that courts are to focus on the "substance of free exercise protections"—not "on the presence or absence of magic words."

Dissenting from the denial of rehearing en banc, Judge VanDyke, joined by Judges Bumatay and Tung, wrote that Judge Bumatay aptly explained why California cannot validly weaponize its Blaine Amendment, which prohibits the teaching of "sectarian or denominational doctrine" in California's public schools, to discriminate against religion. Judge VanDyke wrote separately to explain that California's Blaine Amendment presents a clear cut case of attempted

facial discrimination *between* competing religious beliefs because the law expressly allows the teaching of nonsectarian, generic Christian doctrine in public schools, but not the teaching of any sectarian doctrine. That discrimination *between* religions plainly runs afoul of the First Amendment's Religion Clauses.

## COUNSEL

Alexander Kazam (argued) and E. Caroline Freeman, King & Spalding LLP, Washington, D.C.; Nicole Bronnimann, King & Spalding LLP, Houston, Texas; Ethan P. Davis, King & Spalding LLP, San Francisco, California; David J. Hacker, Kayla A. Toney, and Jeremiah G. Dys, First Liberty Institute, Plano, Texas; Camille P. Varone, First Liberty Institute, Washington, D.C.; for Plaintiffs-Appellants.

Thomas H. Prouty (argued) and D. Michael Ambrose, Deputy General Counsel; Paul Gant and Bruce Yonehiro, Assistant General Counsel; Len Garfinkel, General Counsel; California Departrossment of Education, Sacramento, California; Kendra J. Hall (argued), Greta A. Proctor, Yulian Y. Kolarov, and Sean M. Sullivan, Procopio Cory Hargreaves & Savitch LLP, San Diego, California; Kevin M. Troy (argued), Paul C. Minney, and Adam D. Afshar, Young Minney & Corr LLP, Sacramento, California; Anthony M. DeMaria, DeMaria Law Firm, Fresno, California; Ross R. Nott and Tanveer Moundi, Spinelli Donald & Nott, Sacramento, California; for Defendant-Appellees.

Christopher Schweickert, Seto Wood & Schweickert LLP, Pleasant Hill, California, for Amici Curiae the Hive Method LLC and Awaken Church DBA Awaken Academy.

Kathryn M. Capizzi, Maynard Nexsen PC, New York, New York; Sue G. Stricklett, American Hindu Coalition, Sterling, Virginia; for Amicus Curiae American Hindu Coalition.

Alexander J. Luchenitser and Luke Anderson, Americans United for Separation of Church and State, Washington, D.C., for Amicus Curiae Americans United for Separation of Church and State.

Christopher A. Brook, Patterson Harkavy LLP, Chapel Hill, North Carolina, for Amici Curiae National Alliance for Public Charter Schools, California Charter Schools Association, Association of Personalized Learning Schools & Services, and Charter Schools Development Center.

Ilya Shapiro and Tim Rosenberger, Manhattan Institute, New York, New York; Nicole S. Garnett, Notre Dame Education Law Project, Notre Dame, Indiana; for Amici Curiae Manhattan Institute and Notre Dame Education Law Project.

Dean McGee and Buck Dougherty, Liberty Justice Center, Austin Texas, for Amicus Curiae Liberty Justice Center.

Jeffrey M. Schwab and Jesse Leon, Liberty Justice Center, Austin, Texas; Howard Slugh, Jewish Coalition for Religious Liberty, Washington, D.C.; for Amici Curiae Liberty Justice Center, Abraham Knowledge Academy, Coalition of Virtue, and the Jewish Coalition for Religious Liberty.

Katherine I. Hartley, Pacific Justice Institute, Coeur d'Alene, Idaho, for Amicus Curiae Pacific Justice Institute.

Daniel J. Grabowski, Alliance Defending Freedom, Lansdowne, Virginia; Ryan J. Tucker, Jeremiah Galus, and

Mark Lippelmann, Alliance Defending Freedom, Scottsdale, Arizona; for Amicus Curiae Alliance Defending Freedom.

Sean T.H. Dutton and Kienbaum Hardy, Viviano Pelton & Forrest, Birmingham, Michigan, for Amicus Curiae for Coalition for Jewish Values.

Noel J. Francisco, Jeffrey R. Johnson, John C. Brinkerhoff Jr., and Janessa B. Mackenzie, Jones Day, Washington, D.C.; Eric C. Rassbach, The Hugh and Hazel Darling, Religious Liberty Clinic, Caruso School of Law, Pepperdine University, Malibu, California; for Amicus Curiae Religious Freedom Institute.

Erin N. Cox, Kasdin M. Mitchell, Jessica A. Lee, and Shane D. O'Connor, Kirkland and Ellis LLP, Dallas, Texas, for Amicus Curiae Association of Christian Schools International.

Blaine H. Evanson, Joseph Edmonds, Branton J. Nestor, James R. Lee, Minsoo Kim, Haley Denler, and Varant Anmahouni, Gibson Dunn & Crutcher LLP, Irvine, California; for Amicus Curiae National Council of Young Israel.

---

## ORDER

The opinion filed September 11, 2025, and published at 152 F.4th 1050, is amended as follows:

On slip opinion page 11, lines 7-16, replace <The parties dispute whether the funding and materials California provides to parents for use in independent study programs are a generally available public benefit. But even assuming

that they are, the programs at issue in this case are sufficiently public to allow California to condition participation on parents' use of secular curricula. The status of those programs under California law as part of the state system of public education is consistent with the critical features that the Supreme Court found characteristic of public schools in *Carson*.> with <Plaintiffs contend that the funding and materials California provides to parents for use in the public charter schools' independent study programs are a generally available subsidy for private homeschooling. Defendants contend that the public charter schools' independent study programs, including the funding and materials provided within those programs, are instead part of California's public education system. To resolve that dispute, we ask whether the independent study programs have the critical features that the Supreme Court found characteristic of public schools in *Carson*.>.

On slip opinion page 14, lines 5-6, replace <the programs sufficiently public to> with <them public school programs and>.

The amended opinion will be filed concurrently with this order.

Judges Miller and Sung voted to deny the petition for rehearing en banc, and Judge Hurwitz so recommended. The full court was advised of the petition for rehearing en banc. A judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of votes of the nonrecused active judges in favor of en banc consideration. Fed. R. App. P. 40.

The petition for rehearing en banc (Dkt. No. 138) is **DENIED**, and no further petitions for rehearing will be entertained.

## OPINION

HURWITZ, Circuit Judge:

California provides free public education through its common schools. *See* Cal. Const. art. IX, § 5. It long did so through brick-and-mortar schools owned and operated by public school districts. *See id.*; Cal. Educ. Code § 35160. In 1992, California authorized the establishment of charter schools, "public schools funded with public money but run by private individuals or entities rather than traditional public school districts." *Today's Fresh Start, Inc. v. L.A. Cnty. Off. of Educ.*, 303 P.3d 1140, 1144 (Cal. 2013); Cal. Educ. Code § 47600 *et seq*. Like traditional public schools, charter schools can provide non-classroom-based instruction, *see* Cal. Educ. Code § 47612.5(d), (e), including "independent study" programs, *id.* § 51747.3, in which parents provide home-based direct instruction approved by the school and coordinated, evaluated, and supervised by state-certified teachers, *id*. § 51747.5(a). To participate in these programs, parents must enter into a contract with the school specifying the objectives, methods of study, and methods used for evaluating student work. *See id.* § 51747(g)(2), (g)(9)(A)(i). The school is then required to provide appropriate materials and services necessary to achieve the agreement's objectives. *See id.* §§ 51746, 51747(g)(3); Cal. Code Regs. tit. 5, § 11700(i).

The plaintiffs in this 42 U.S.C. § 1983 action are parents and guardians of students enrolled in independent study programs at two California charter schools who requested that the schools purchase and permit the use of sectarian curricular materials for instruction in the programs. The schools rejected those requests because California law

provides that "sectarian or denominational doctrine" shall not "be taught, or instruction thereon be permitted, directly or indirectly, in any of the common schools of this State," Cal. Const. art. IX, § 8, and that "a charter school shall be nonsectarian in its programs," Cal. Educ. Code § 47605(e)(1). The plaintiffs claim that the rejection of their request pursuant to those laws violates the Free Exercise and Free Speech Clauses of the First Amendment.

The district court dismissed the operative complaint for failure to state a claim. We affirm.

## I.

### Factual and Procedural Background

John and Breanna Woolard, Hector and Diana Gonzales, and Carrie Dodson (collectively, "Plaintiffs") are parents or guardians of children who were enrolled at two California charter schools, Blue Ridge Academy and Visions in Education, and participated in the schools' independent study programs.[1]

Plaintiffs each unsuccessfully requested that the charter schools purchase sectarian curricular materials for use in those programs. Blue Ridge denied the Woolards' request to purchase the Bob Jones University "Focus on Fives" curriculum, a "[w]orldview shaping" curriculum that teaches that "God is great, and God is good; God created me and all things; the Bible is God's Word, and it is true; and I learn in order to serve God and others." Blue Ridge denied the Gonzaleses' request to purchase a similar Bob Jones University curriculum and the Woolards' request to

---

[1] The Woolards' daughter and the Gonzaleses' two grandchildren were enrolled at Blue Ridge; Dodson's son was enrolled at Visions.

purchase "Bede's History of Me," a book that provides "[a] clear way to teach the importance of timelines and how God works in time." Visions denied Dodson's request to purchase "The Good and the Beautiful," a "faith-based curriculum" that emphasizes "family, God, high character, nature, and wholesome literature."

Plaintiffs then sued the two charter schools and some of their officials; officials of the Maricopa Unified School District, the chartering authority for Blue Ridge; officials of the San Juan Unified School District, the chartering authority for Visions; and the State Superintendent of Public Instruction. In dismissing the operative complaint, the district court rejected the free exercise claims because charter schools are public schools "included in California's free public school system," and thus are allowed to provide a strictly secular education. The court rejected Plaintiffs' assertion that they were being "categorically excluded" from a generally available public benefit because of their religious exercise, noting that (1) "[t]here are no 'public benefits' in the form of grants or otherwise that the state is excluding Plaintiffs from" and (2) "[t]his case involves California's laws and regulations for state funded public schools, not private schools." Finally, the court held that because a public school's curriculum is government speech, Plaintiffs did not plausibly allege a Free Speech Clause violation.

Plaintiffs timely appealed. We have jurisdiction under 28 U.S.C. § 1291,[2] and "review de novo an order granting a

---

[2] The State Superintendent and Blue Ridge Academy (but not its officials) claim that the Eleventh Amendment deprives an Article III court of jurisdiction over the action as to them. We disagree. Because Plaintiffs seek only prospective non-monetary relief, the *Ex parte Young* exception applies if the defendant state official has "some connection

motion to dismiss for failure to state a claim." *Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.*, 15 F.4th 885, 889 (9th Cir. 2021).

## II.

## Discussion

The Supreme Court has recently confirmed that the Free Exercise Clause does not prohibit a state from providing "a strictly secular education in its public schools." *Carson v. Makin*, 596 U.S. 767, 785 (2022). Plaintiffs do not dispute this foundational principle but argue that the charter schools' independent study programs are in substance private homeschooling, not public education. Plaintiffs then assert that because California could not exclude potential recipients of state grants for private homeschooling based on religious belief, it cannot refuse to honor their requests for funding of sectarian instruction. Plaintiffs also contend that requiring parents to use state-approved materials in independent study programs that do not reflect their religious views is compelled speech in violation of the Free Speech

---

with the enforcement of the act." 209 U.S. 123, 157 (1908). The Superintendent has the requisite connection. He is charged with "[s]uperintend[ing] the schools of this state," Cal. Educ. Code § 33112(a), and with executing the State Board of Education's policies, *id.* § 33111, including those governing independent study programs, *see id.* § 51749.3. And under the test set forth in *Kohn v. State Bar of Cal.*, 87 F.4th 1021, 1030 (9th Cir. 2023) (en banc), the claims against Blue Ridge are also not barred by the Eleventh Amendment. California does not extend governmental immunity to charter schools, *see Wells v. One2One Learning Found.*, 141 P.3d 225, 243 (Cal. 2006), and Blue Ridge is "operated, not by the public school system, but by" a nonprofit public benefit corporation, a "distinct outside entit[y]," *id.* (emphasis omitted).

Clause of the First Amendment. We address these arguments below.

## A.

We begin with an overview of the legal structure of the California charter school system. As a matter of California law, "charter schools are part of California's single, statewide public school system." *Wilson v. State Bd. of Educ.*, 89 Cal. Rptr. 2d 745, 752 (Ct. App. 1999). Although the defendant charter schools are not operated by public school districts, they are overseen by public "chartering authorities" (school district governing boards) that "approve charters, supervise charter school operations, and revoke charters in the event particular standards and conditions [a]re not met." *Today's Fresh Start*, 303 P.3d at 1144; *see also* Cal. Educ. Code § 47605 (procedure for establishing a charter school); *id.* § 47604.32 (duties of a chartering authority); *id.* § 47607(f)(4) (providing for charter revocation if the charter school "[v]iolated any law"). Like other California public schools, charter schools cannot charge tuition; "cannot discriminate against students on the basis of ethnicity, national origin, gender or disability"; "must meet statewide standards and conduct pupil assessments applicable to pupils in noncharter public schools"; must provide instruction meeting the same statewide standards as other California public schools; and must hire state-certified teachers. *Wilson*, 89 Cal. Rptr. 2d at 753. And charter schools are "eligible equally with other public schools for a share of state and local education funding." *Today's Fresh Start*, 303 P.3d at 1145-46.

Plaintiffs nonetheless argue that the defendant charter schools' independent study programs are really homeschooling and that the schools' provision of curricular

materials should be treated as a generally available public benefit in aid of homeschooling, access to which cannot be denied based on Plaintiffs' religious beliefs. The argument is premised on three recent Supreme Court decisions holding that when a state creates a generally available public benefit, it cannot exclude a potential recipient from the benefit because of religious status or religious use. *See Carson*, 596 U.S. at 789 (holding that a state violated the Free Exercise Clause in permitting parents whose children did not have access to a public school to use tuition vouchers at all private schools except religious ones); *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 488-89 (2020) (holding that the exclusion of religious private schools from a state private school scholarship program violated the Free Exercise Clause); *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 467 (2017) (holding that a state's denial of a grant to a church for use in upgrading a playground violated the Free Exercise Clause).

At the same time, not all government decisions that engender religious objections impose burdens on religion that fall afoul of the Free Exercise Clause. As the Supreme Court made clear in *Carson*, a state's decision to provide a "strictly secular" public education does not do so. *See* 596 U.S. at 785. Secular public education neither "coerce[s]" parents "into violating their religious beliefs" nor denies religious parents "an equal share of the rights, benefits, and privileges enjoyed by other citizens." *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 449 (1988).

Plaintiffs contend that the funding and materials California provides to parents for use in the public charter schools' independent study programs are a generally available subsidy for private homeschooling. Defendants contend that the public charter schools' independent study

programs, including the funding and materials provided within those programs, are instead part of California's public education system. To resolve that dispute, we ask whether the independent study programs have the critical features that the Supreme Court found characteristic of public schools in *Carson*. There, although Maine argued that its program was equivalent to funding a secular public education, the Court identified several important distinctions between public schools and the private schools for which the program paid tuition. 596 U.S. at 782. First, Maine public schools, unlike the state's private schools, "have to accept all students." *Id.* at 783. Second, public schools, unlike private schools, are free to attend. *Id.* Third, public schools must follow extensive state-imposed curricular requirements, while private schools are "subject only to general standards and indicators governing the implementation of their own chosen curriculum" and "need not administer the annual state assessments." *Id.* at 783-84 (cleaned up). Fourth, "other distinctions," like that public schools must "hire state-certified teachers," separate the two. *Id.* at 784.

The independent study programs at issue here share the features of public education that the Court emphasized in *Carson*. California charter schools operating independent study programs must be free to attend and accept all students for which they have capacity. Cal. Educ. Code § 47605(e)(1), (2). The programs must "be of the same rigor, educational quality, and intellectual challenge substantially equivalent to" classroom-based instruction and must be "aligned to all relevant local and state content standards," including those adopted by the California Board of Education. *Id.* § 51749.5(a)(4)(A); *see id.* § 47605(d)(1); Cal. Code Regs. tit. 5, § 11701.5(a). The state standards for

mathematics, for example, are laid out in a 151-page document that gives detailed descriptions of the skills and content that students should master at each grade level. *See* Cal. State Bd. of Educ., California Common Core State Standards: Mathematics (2014), www.cde.ca.gov/be/st/ss/documents/ccssmathstandardaug2013.pdf [https://perma.cc/LV9H-A4R2]. Independent study students must take state assessments that test their ability to meet those standards. Cal. Educ. Code § 47605(d)(1).

In addition, independent study programs must be coordinated and evaluated by, and "under the general supervision of," state-certified teachers. *Id.* § 51747.5(a); *see id.* § 51749.5(a)(3). Those teachers must provide "continuing oversight of the study design, implementation plan, allocation of resources, and evaluation[s]." Cal. Code Regs. tit. 5, § 11700(b) (defining "[g]eneral supervision"). To that end, an independent study student must enter into a written agreement with the school that includes the "objectives and methods of study for the pupil's work, and the methods used to evaluate that work." Cal. Educ. Code § 51747(g)(2). The study methods must be "selected by the supervising teacher as the means to reach the educational objectives," and the evaluation methods must involve "a certificated teacher personally assess[ing] the extent to which achievement of the pupil . . . meets the objectives of an assignment." Cal. Code Regs. tit. 5, § 11700(e), (f) (defining "[m]ethod utilized to evaluate" and "[m]ethods of study").

California private schools—including private homeschooling programs—are subject to none of those requirements. Instead, they only need to file regular registration affidavits, keep attendance, and provide English-language instruction in broadly framed "areas of

study." Cal. Educ. Code §§ 33190, 48222, 51210, 51220. For mathematics in grades 7-12, for example, a curriculum satisfies private-school content standards if it includes "instruction designed to develop mathematical understandings, operational skills, and insight into problem solving procedures." *Id.* § 51220(f). Beyond teaching those general principles, private schools do not need to follow any curricular requirements, and their students do not need to take any statewide tests. Nor does California require that private schools be accredited. *See Private Schools Frequently Asked Questions*, Cal. Dep't of Educ. (Sep. 3, 2025), www.cde.ca.gov/sp/ps/psfaq.asp [https://perma.cc/EZ8K-RUSH]. And private-school teachers do not need to be certified as long as they are "capable of teaching." Cal. Educ. Code § 48222.

Plaintiffs have alleged, and we take as true, that the defendant charter schools provide parents great flexibility to choose which pre-existing curricula to use to educate their children, or to create their own. But with that flexibility comes substantial legal constraints not applicable to private schools. Plaintiffs also emphasize that, unlike in Maine's (and most) public schools, students in the independent study programs receive instruction in their homes, and the direct educators are their parents. But in contrast to private homeschooling, parents in independent study programs can teach only under the supervision of state employees. The extensive legal requirements applicable to the defendant charter schools' independent study programs make them public school programs and defeat Plaintiffs' free exercise claim.

**B.**

Plaintiffs' compelled speech claim fares no better. It is premised on the argument that "[w]hen parents in the Blue Ridge and Visions programs select a diverse array of curricula for their children's diverse needs," the parents are speaking, not the government. However, we have held that a public school's curriculum is an "expression of its policy," *Downs v. L.A. Unified Sch. Dist.*, 228 F.3d 1003, 1013-15 (9th Cir. 2000), and that "information and speech . . . present[ed] to school children may be deemed to be part of the school's curriculum and thus School District speech," *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 728 (9th Cir. 2022). Government speech is "not subject to scrutiny under the Free Speech Clause." *Pleasant Grove City v. Summum*, 555 U.S. 460, 464 (2009). Moreover, the state "is not precluded from relying on the government-speech doctrine merely because it solicits assistance from nongovernmental sources." *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 562 (2005).

Citing *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995), Plaintiffs also argue that a public school cannot discriminate against religious viewpoints when it creates a limited public forum. *Rosenberger*, however, involved a public university's refusal to fund an otherwise-eligible student news organization with a religious viewpoint. *See id.* at 827. More importantly, it expressly recognized that "[w]hen the University determines the content of the education it provides, it is the University speaking." *Id.* at 833. Just so here. Blue Ridge and Visions, in refusing to permit the use of the requested curricular materials, determined the "content of the education" they would provide and any resulting speech in instruction was theirs, not that of Plaintiffs.

## III.

We **AFFIRM** the judgment of the district court.

---

BUMATAY, Circuit Judge, joined by R. NELSON, COLLINS, VANDYKE, and TUNG, Circuit Judges, dissenting from the denial of rehearing en banc:

Once again, the Ninth Circuit has greenlit state discrimination against religion.

## I.

The State of California offers parents funds and guidance to help them homeschool their children based on an education of their choosing. These independent study programs, run through an approved charter school, allow students to "receive instruction in their home," make parents "the direct educators," and "provide parents great flexibility to choose" or "create their own" curricula. Am. Op. 17. And they assist parents by paying for educational materials and services the parents select. *See* Cal. Educ. Code §§ 51746, 51747(g)(3); Cal. Code Regs. Tit. 5, § 11700(i). Through the program, a state-certified teacher meets with parents to provide guidance, approves expenditures of state funds, and reviews work samples for quality, completion, and mastery of California educational standards. *See* Cal. Educ. Code §§ 51747.5(a), 51746, 51747(g)(3); Cal. Code Regs. Tit. 5, § 11700(i). The goal of the independent study programs is to provide "flexibility" through "a homeschool model" to tailor to "each student's individualized learning style." *See* Blue Ridge Academy 2021 Renewal Petition 10.

While flexibility and parental choice are the key attributes of the program, under California's version of the Blaine Amendment—a provision "born of bigotry," *Espinoza v. Montana Dep't of Revenue*, 591 U.S. 464, 482 (2020) (simplified)—California denies this choice if parents select curricula based on their religious beliefs. *See* Cal. Const. art. IX, § 8 ("No public money shall ever be appropriated for the support of any sectarian or denominational school[.]"). If parents seek funding for books or course materials deemed "non-secular," then they will be denied or even expelled from the program. So, under the program, parents maintain wide latitude to decide what's best for their children's education—unless they choose a faith-based education. If this sounds like a free exercise violation, it is.

The Ninth Circuit condones this unequal treatment of religious families despite a wall of Supreme Court authority interpreting the Free Exercise Clause as prohibiting this type of discrimination. *See Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 462 (2017); *Espinoza*, 591 U.S. at 475–76; *Carson v. Makin*, 596 U.S. 767, 778 (2022). As we recently said, "a statutory scheme that requires a family to forgo a sectarian education . . . in order to receive special education benefits otherwise available . . . imposes a burden on their free exercise rights." *Loffman v. Cal. Dep't of Educ.*, 119 F.4th 1147, 1168 (9th Cir. 2024) (simplified).

To get around this precedent, a Ninth Circuit panel first invented a new test—the "sufficiently public" test—that it claims circumvents First Amendment scrutiny. *See Woolard v. Thurmond,* 152 F.4th 1050, 1057 (9th Cir. 2025). Under this novel test, whenever actions by private persons were deemed "sufficiently public," the government would be free

to exclude those acting with religious conviction from public benefits. *See id.* But that test has no grounding in precedent or history.

Perhaps sensing the weakness of that analysis, the panel now amends its opinion and simply labels the homeschool programs "public school programs," and, on that basis, excuses the State's religious discrimination. Am. Op. 17. But the mere fact that these independent study programs are operated under the auspices of charter schools that are deemed to be part of the public school system does not transform those parent-focused programs—in which parents teach their own children in their own home with the curricula they choose—into the equivalent of "public school programs." The panel's contrary view is incorrect on both the facts and the law.

Regardless of the superficial labels the panel tries to slap on the homeschool programs, they are benefits to aid parents' private choices and any "target[ing of] religious conduct for distinctive treatment" should "be subjected to the strictest scrutiny." *Carson*, 596 U.S. at 780–81 (simplified). And so both the initial and amended decisions are profoundly wrong. It is thus no wonder that one Justice recently signaled that "[t]he Ninth Circuit . . . [has] significantly misunderstood" the Supreme Court's free exercise jurisprudence and needs a "general course correction." *See Mirabelli v. Bonta*, 146 S. Ct. 797, 805 (2026) (Barrett, J., concurring). Rehearing this case en banc should have been part of that course correction.

## A.

Before turning to how wrong this decision is, let's first discuss what this case is not about. It is not about the Establishment Clause. Not even the Ninth Circuit panel

contends that state funding for religious homeschool programs would violate the Establishment Clause. Unlike instruction in brick-and-mortar public schools, parent-led education within the confines of the family home presents no establishment problem because no government-backed religion is imposed on anyone. After all, the "*sine qua non* of an establishment of religion is actual legal coercion." *Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 75 (2019) (Thomas, J., concurring in the judgment) (simplified). Even if instruction in public-school classrooms may implicate the "coercive pressure" animating the Establishment Clause, *Lee v. Weisman*, 505 U.S. 577, 592 (1992), no such concern exists when parents freely choose a curriculum for their own children in their own home. As is well-established now, "a neutral benefit program in which public funds flow to religious organizations through the independent choices of private benefit recipients does not offend the Establishment Clause." *Carson*, 596 U.S. at 781. Thus, supporting parents homeschooling their own children with religious materials doesn't create an establishment of religion. And that's even more true here where any funding for religious instruction is *twice* removed from the State—first, it goes to a charter school (a privately owned entity operating as a public school) and, second, it goes to the parents' chosen instruction. Indeed, by offering aid for only secular materials, it's California that has a "tendency to coerce" parents "into acting contrary to their religious beliefs." *See Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450 (1988). So enabling private choice—even a choice based on religious conviction—poses no Establishment Clause problem.

And this case isn't about education standards. No one questions that the parents' chosen academic materials meet

California's educational standards.  When one family in this suit tried to buy the works of Jonathan Edwards and William Penn to study colonial America, they were denied—not because of any pedagogical concern, but only because of the materials' "religious content."  The same family was later told they couldn't teach a different faith-based curriculum because, while the "[a]cademics" were "fine," its "religious aspect" was prohibited.  Another family was denied funding when they tried to teach sentence structure using the sentence: "God sends the rain to help plants grow."  A perfectly good sentence, but it was rejected simply because the independent study program "can't accept any work sample with any religious wording on it."  Yet another family tried to offer a course that emphasized "family, God, high character, nature, and wholesome literature."  Though a charter school employee thought that the curriculum "sounds amazing," it was rejected because they could neither approve nor accept any "faith-based curriculum."  And that family's child was later *expelled* for submitting work samples with religious content.  So the concern isn't with the quality of the education that these parents are choosing; the only problem is that they're choosing an education based on faith.

## B.

Our denial of rehearing en banc was wrong for at least two reasons.

First, this should have been a straightforward ruling— the families challenging the independent study programs' exclusion of faith-based curricula have easily alleged a free exercise violation.  Simply, a State cannot discriminate against the religious when providing public benefits. Whether it be grants, tuition assistance, or tax benefits, "once

a State decides to" offer the public a subsidy, "it cannot disqualify [members of the public] solely because they are religious." *See Carson*, 596 U.S. at 785 (simplified). It's thus a textbook free exercise violation when a State "single[s] out the religious for disfavored treatment." *Trinity Lutheran*, 582 U.S. at 460.

Yet this discrimination is exactly what happens with California's homeschool program. If parents choose a secular homeschool education for their children, these families receive full support and funding. But if parents choose to ground their children's homeschool education in faith, those families are stymied or even expelled from the program. By conditioning participation in the homeschool program on disavowing a faith-based curriculum, California's program "effectively penalizes the free exercise of [these families'] constitutional liberties." *Id.* at 462 (simplified). And this interferes with "[t]he practice of educating one's children in one's religious beliefs," which "receives a generous measure of protection from our Constitution." *Mahmoud v. Taylor*, 606 U.S. 522, 547 (2025).

Of course, a "State need not subsidize private education," *Espinoza*, 591 U.S. at 487, and may provide "strictly secular education in its public schools." *Carson*, 596 U.S. at 785. So a State can prohibit faith-based instruction in its public schools without offending the free exercise right. But once a State decides to offer parents financial assistance for education that the parents conduct, exercising substantial choice as to the instructional materials, the Free Exercise Clause's anti-discrimination principle applies with full force. Under the programs at issue, parents do the day-to-day teaching, educate their children in the home, and choose the substance of their

curricula. This is the opposite of the sort of public-school education referenced in *Carson*. That privately run charter schools, which operate under the auspices of the public school system, approve and minimally supervise courses doesn't change that conclusion. Indeed, in another context, courts have recognized that mere "regulation, even if extensive and detailed," does not "make a [private actor's] actions *state action*." *Rendell-Baker v. Kohn*, 457 U.S. 830, 841 (1982) (simplified) (emphasis added). While charter-school teachers meet with families and must approve parents' curricula, parent-led homeschool education involves a critical measure of private curricular choice that sets it apart from prototypical public-school education.

Nor does an establishment concern justify this discrimination. As stated earlier, parents—not the government—freely and independently choose to spend funds on faith-based instruction. That makes all the difference here. Simply, "[a] State's antiestablishment interest does not justify enactments that exclude some members of the community from an otherwise generally available public benefit because of their religious exercise." *Carson*, 596 U.S. at 781.

Thus, California straightforwardly violates the families' free exercise rights. As in *Espinoza*, California's "no-aid provision penalizes [parents'] decision[s] by cutting families off from otherwise available benefits if they choose a religious [curriculum] rather than a secular one, and for no other reason." 591 U.S. at 486. As in *Carson* and *Espinoza*, the State "disqualif[ies]" some homeschool parents "solely because they are religious." *Id.* at 487. This, the Free Exercise Clause does not allow.

Second, both the initial and amended panel decisions misunderstand free exercise doctrine. To begin, the panel at first erred in creating an exception to the Free Exercise Clause's anti-discrimination principle based on its novel "sufficiently public" test. Rather than hewing to *Carson*'s distinction between "public schools," where "strictly secular education" is permissible, and "subsidi[es for] private education," where the State cannot discriminate against the religious, 596 U.S. at 785, the panel invented a new, mushy "in between" category. Under that malleable test, any benefit supporting a "sufficiently public" activity would be exempt from free exercise protection. In other words, the panel permitted unequal treatment of religious instruction whenever "sufficiently public" action is involved. But *Carson* never endorsed such a test, and it's inconsistent with history and precedent.

Indeed, as a historical matter, "[p]rimary education was haphazard, private, and almost invariably religious," and the government's support "typically took the form of grants to private schools"—religious schools of all different stripes. Nathan S. Chapman & Michael W. McConnell, Agreeing to Disagree: How the Establishment Clause Protects Religious Diversity and Freedom of Conscience 119 (2023). "In the founding era and the early 19th century, governments provided financial support to private schools, including denominational ones." *Espinoza*, 591 U.S. at 480. "Far from prohibiting such support, the early state constitutions and statutes actively encouraged this policy." *Id.* (quoting Lloyd P. Jorgenson, The State and the Non-Public School, 1825–1925, 4 (1987)).

Recognizing the "sufficiently public" test unworkable, the panel changes course by amending its opinion. Now, it simply slaps a "public school" label on the homeschool

programs and calls them exempt from free exercise scrutiny. *See* Am. Op. 17. The panel belatedly asserts that the requirements of the homeschool program "make them public school programs [that] defeat Plaintiffs' free exercise claim." *Id.* The panel bases its new holding on what it perceives are the "critical features that the Supreme Court found characteristic of public schools in *Carson." Id*. at 15. But the panel fundamentally misunderstands *Carson*'s point. *Carson* didn't establish a test to determine what constitutes a "public school." Instead, *Carson's* discussion of some characteristics of prototypical public schools, which the State "may permissibly require to be secular," was to refute the State's pretextual claim that its funding benefit was limited to the "rough equivalent of [a] public school education." *Carson,* 596 U.S. at 782 (simplified). So *Carson* showed that the State was "manipulat[ing]" labels, much like the panel here, to skirt First Amendment scrutiny. *Id.* at 784 (simplified). In no way did *Carson* announce a new test for state action by private parties, which would allow the State to co-opt the activities of parents teaching their own children as state action and permit discrimination against the religious.

And in labeling California's homeschool programs as "public school programs," the panel relies on the flimsiest grounds—that these homeschool kids are subject to basic "state assessments" and the "general supervision" of a charter school employee. *See* Am. Op. 16. But that defies common sense as well as established law. Does anyone really think that parents teaching their own children in their own home, based on a curriculum of their own choosing, somehow transforms them into "public school" teachers? Of course not. And the answer doesn't change just because the government pays for their books and charter-school

employees provide modest oversight. Conflating the two trivializes the "numerous and important" differences, *Carson*, 596 U.S. at 783, between public schools and homeschool education—even homeschooling with state support. A world of difference exists between the public-school classroom—where government employees teach government-mandated curricula in a government-built classroom open to all—and benefits for parents teaching their own children in their home with curricula they choose. Adhering to modest state requirements simply doesn't transform parents teaching their children around the kitchen table with textbooks they choose into agents of the State providing "public school" education. Doing so casts parents into the equivalent of state workers and parent-designed curricula into state-mandated curricula. That ignores the critical feature of the homeschool programs—that parents design and teach their chosen curricula in the privacy of the parents' home. Although the curriculum must satisfy general performance metrics, those standards do not dictate the specific content of the curricular materials, which are chosen by the parents. So here, as in *Carson*, "the curriculum taught [through the homeschool programs] need not even resemble that taught in the [California] public schools." *Id.* "In short, it is simply not the case that these [homeschool programs], to be eligible for state funds, must offer an education that is equivalent—roughly or otherwise—to that available in the [California] public schools." *Id.* at 784.

By fixating on the "public school" label and ending its analysis, the panel ignores Carson's warning that we are to focus on the "substance of free exercise protections"—not "on the presence or absence of magic words." *Id.* at 785. The panel cannot merely "reconceptualiz[e] the public

benefit" with made-up labels to escape the free exercise guarantee.  *Id.*  With few constraints, California's homeschool programs let parents choose or design their own curriculum to educate their own children in their own home.  That choice is withheld, however, if those parents choose faith-based instruction.  This discrimination goes to the heart of the "substance of free exercise protections," *id.*, and undermines parents' "right to teach [their children] religion in the confines of [their] own home," *Mahmoud*, 606 U.S. at 547 (simplified).  So the parents here easily allege a valid First Amendment claim.

## C.

The disturbing impact of the panel's decision cannot be overstated.  Going forward in the Ninth Circuit, whenever the government successfully labels an activity as "public," it receives carte blanche to discriminate against the religious.  Think about it.  If educating one's children in the privacy of one's own home according to one's private choices constitutes "public school" activity, then pretty much anything can qualify as a governmental program exempt from First Amendment scrutiny.  This view flouts *Trinity Lutheran*, *Espinoza*, and *Carson* and resurrects the divisive purpose of the Blaine Amendment and its state-level analogues with a fury.  By giving the Free Exercise Clause such a cramped reading, the panel tells the religious that they must forgo either their faith or the benefits available to everyone else.  We should have taken this case en banc rather than endorse such a far-reaching test.

## II.

California's independent study programs help parents give their children the education of their choice.  But California's ban on aid to non-secular instruction whisks

those benefits away from religious parents seeking to provide their children an education grounded in their faith. This harms parents' ability to inculcate "moral standards, religious beliefs, and elements of good citizenship" in their children. *Wisconsin v. Yoder*, 406 U.S. 205, 233 (1972). To justify this burden on their free exercise rights, the panel superficially labels parent-led education programs as "public school programs." But that's wrong. California's program straightforwardly "single[s] out the religious for disfavored treatment," *Trinity Lutheran*, 582 U.S. at 460, and "disqualif[ies] some [religious families] solely because they are religious," *Carson*, 596 U.S. at 785 (simplified). This should have been an easy case under the Free Exercise Clause.

Because our court blesses a violation of free exercise rights, I respectfully dissent from the denial of rehearing en banc.

---

VANDYKE, Circuit Judge, joined by BUMATAY and TUNG, Circuit Judges, dissenting from the denial of rehearing en banc:

No one disputes that California blatantly discriminated against religion in this case. The panel opinion doesn't dispute that California uniquely singled out religion for disfavored treatment when it refused to fund the plaintiffs' proposed independent-study curricula, solely because those materials contained religious content. *See* Amended Panel Op. 10–11. Nor does California's state superintendent of public instruction dispute the intentional discrimination. *See* Answering Brief of the State Superintendent of Public

Instruction at 16 (noting that California "requir[es] that its system's officials adopt secular curricula for credit in and progression through the public school system").  Indeed, given the "great flexibility" California offers to parents in fashioning state-funded independent-study curricula for their children, even a heavily Confucianist, Stoic, Marxist, or Woke curriculum would presumably pass muster under state law—but one with a whiff of religious content would not.  Amended Panel Op. 17.

Why such open discrimination against religion?  The defendants' hands were tied, they assert, by California's Blaine Amendment, which prohibits the teaching of "sectarian or denominational doctrine" in California's public schools.  Cal. Const. art. IX, § 8.  And—according to the defendants, the district court, and the panel—the plaintiffs' proposed curricula were "sectarian" because they endorsed religious viewpoints.

In his dissental, Judge Bumatay aptly explains why California cannot validly weaponize its Blaine Amendment to discriminate against religion.  I agree and readily join.  If the Supreme Court has taught us anything in the past decade or so, it's that religious educators cannot be "disqualified from [a] generally available benefit 'solely because of their religious character.'" *Carson ex rel. O.C. v. Makin*, 596 U.S. 767, 780 (2022) (quoting *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 475 (2020)); *see also Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 462 (2017).  The most noteworthy twenty-first-century Supreme Court case to permit such blatant discrimination against religion is *Locke v. Davey*, 540 U.S. 712 (2004), where the Court upheld a Washington state scholarship program that excluded students seeking a degree in theology.  But "*Locke* cannot be read beyond its narrow focus on

vocational religious degrees to generally authorize [a] State to exclude religious persons from the enjoyment of public benefits on the basis of their anticipated religious use of the benefits." *Carson*, 596 U.S. at 789. To the extent that *Locke* remains good law, it has been cabined to its facts. Not even the panel cited it in defense of its holding. *See* Amended Panel Op. The clear trend in First Amendment jurisprudence accords with Judge Bumatay's originalist analysis, and the panel opinion here represents an unfortunate detour that deserved correction by our en banc court.

But there's another reason why California's Blaine Amendment runs afoul of the First Amendment, and I write separately to explain it. The defendants, the district court, and the panel simply took for granted that "sectarian" means "religious." But linguistics and history show something else. The push for "nonsectarian" education did not represent a nineteenth-century attempt to secularize the first public schools—it instead represented a compromise among the Protestant Christian majority to educate public-school children in Christian teaching without wading into areas of denominational disagreement. The word "sectarian" thus deliberately encompassed *some* religious beliefs (such as beliefs peculiar to Catholics or Mormons, or even denominational doctrinal divides between Protestants), but not *all* religious beliefs (such as teaching from the King James Bible and the Apostles' Creed).

California's Blaine Amendment thus presents a clear-cut case of attempted facial discrimination *between* competing religious beliefs. On its face, the law expressly allows the teaching of nonsectarian, generic Christian doctrine in public schools, but not the teaching of any sectarian doctrine. That discrimination *between* religions plainly runs afoul of the First Amendment's Religion Clauses, as the unanimous

Supreme Court clarified once again just last term. *See Cath. Charities Bureau, Inc. v. Wisc. Lab. & Indus. Rev. Comm'n*, 605 U.S. 238, 247 (2025) (noting that "[a] law that differentiates between religions along theological lines" violates the Establishment Clause and the Free Exercise Clause).

## I.

The key word in this case is "sectarian." California's Blaine Amendment says, in its entirety:

> No public money shall ever be appropriated for the support of any *sectarian* or denominational school, or any school not under the exclusive control of the officers of the public schools; nor shall any *sectarian* or denominational doctrine be taught, or instruction thereon be permitted, directly or indirectly, in any of the common schools of this State.

Cal. Const. art. IX, § 8 (emphases added). And California's Education Code further provides that "a charter school shall be *nonsectarian* in its programs, admission policies, employment practices, and all other operations." Cal. Educ. Code § 47605(e)(1) (emphasis added).

What made the curricular materials that Plaintiffs sought to use "sectarian"? To the charter schools that refused to let Plaintiffs use the materials, it was the mere fact that the materials endorsed religious viewpoints. The district court uncritically accepted that understanding of California's Blaine Amendment, explicitly equating "sectarian" with "religious," and explaining that "[o]ne requirement for all of

California's public schools, including charter schools, is that they remain nonsectarian (non-religious) in all their programs and operations." And though our court's three-judge panel didn't define "sectarian," it referenced statements like "God is great, and God is good" and "the Bible is God's Word, and it is true," as evidence of the supposedly "sectarian" character of the materials that California deemed to flunk its Blaine Amendment. Amended Panel Op. 10. The schools, the district court, and the panel thus all seem to be on the same wrong page: "sectarian" is just another word for "religious."

But "sectarian" doesn't mean "religious." It didn't mean "religious" when California adopted its Blaine Amendment nearly 150 years ago, and it still doesn't today. *See* Webster's International Dictionary of the English Language 1301 (Noah Porter ed. 1898) (defining "[s]ect," in relevant part, as "the believers in a *particular* creed, or upholders of a *particular* practice" (emphases added), and defining "[s]ectarian," in relevant part, as "[p]ertaining to a sect, or to sects; peculiar to a sect; bigotedly attached to the tenets and interests of a denomination"); *Sectarian*, Black's Law Dictionary (12th ed. 2024) (defining "sectarian," in relevant part, as "[o]f, relating to, or involving a *particular* religious sect; esp., supporting a *particular* religious group and its beliefs" (emphases added)). Nineteenth-century dictionaries show that the word "sectarian" was sometimes used to describe non-mainstream religious adherents and persons commonly understood to be "bigots" or "heretics." Robert G. Natelson, *Why Nineteenth Century Bans on "Sectarian" Aid Are Facially Unconstitutional: New Evidence on Plain Meaning*, 19 Federalist Soc'y Rev. 98, 102–03 (2018). Most nineteenth-century Americans considered Catholics and Mormons to be "sectarian," and some contemporaneous

writers thought that Muslims and some Jews could be "sectarian" too, while Christians such as Unitarians, Quakers, Methodists, Baptists, Episcopalians, and even Orthodox Christians were spared the label. *Id.* at 104–05. But either way, saying that "sectarian" means "religious" is like saying that "dime" means "coin." All sectarian materials are religious, but not all religious materials are sectarian.

A proper understanding of the history of religion in American education—and the corresponding enactment history of the Blaine Amendments—clarifies this distinction. Around the time of our Nation's Founding (before the advent of universal public education), essentially all schools, even those affiliated with local governments, used the Bible and other Christian religious texts "extensively" to teach reading, writing, and moral formation. Steven K. Green, *The Bible, the School, and the Constitution* 15 (2012). In the nineteenth century, "most Americans, Protestant and Catholic alike, believed that civic education could not be divorced from instruction into religious and moral values." *Id.* at 18. "For the first half of the century, the point of disagreement" about the role of religion in education "was not whether public schooling should be religious or secular, but how religious that education should be," because the idea of a secular school was borderline inconceivable at the time. *Id.*

The nineteenth century brought about increased religious heterogeneity. For the first fifty years of American history, religious differences were largely defined by region. Noah Feldman, *Non-Sectarianism Reconsidered*, 18 J.L. & Pol. 65, 69–70 (2002). But with the Second Great Awakening came the breakdown of the dominant regional denominations into numerous diverse sects. *Id.* at 70. For

instance, in New England (long a Congregationalist stronghold) Congregationalism split into Trinitarianism and Unitarianism, and the South (in which Anglicanism and Presbyterianism had predominated) saw a rise in Baptist and Methodist Christianity. *Id.*

About the same time, the common school movement garnered traction. Proponents of the movement sought to bring about universal education not just to teach American children basic functional skills but "to produce citizens capable of virtuous political action" through moral education. *Id.* at 71. Horace Mann, a leader of the movement, believed that "moral education was 'a primal necessity of social existence'" and held, "as an 'eternal and immutable truth' that a good result in practical morals 'can never be attained without religion.'" *Id.* at 73 (quoting 4 Life & Works of Horace Mann 222, 283, 286 (Lee & Shepard ed., 1891)).

But how could a society of many different religious sects and denominations (which often had divergent liturgical practices and theological beliefs) develop a universal system of moral education based on religious truths? Nonsectarianism was the answer. If the proposed common schools taught, say, Methodist doctrine to the exclusion of Anglican doctrine, then Anglicans would have withdrawn their support for universal public education altogether. *See id.* at 74. But if the schools taught the fundamentals of Christian doctrine that were common to all Protestants without wading into areas of denominational disagreement, then the schools could still provide the thrust of moral and religious education in a way that wouldn't arouse objections from any particular group of Protestants. *See id.*; *see also* Green, *supra*, at 19 ("That the common schools were consciously Protestant was not denied; however, the

Protestant complexion of early common schooling reflected the belief that the schools could promote commonly shared beliefs and practices without reverting to denominationalism."). Mann himself proposed a system that would "inculcate[] all Christian morals," "found[] its morals on the basis of religion," and "welcome[] the religion of the Bible" without "act[ing] as an umpire between hostile religious opinions." 4 Life & Works of Horace Mann at 311–12. And because Protestant Christianity was the dominant religion at the time, the compromise worked—at least for a time. *See* Green, *supra*, at 19.

The upshot: the whole point of nonsectarianism as reflected in California's Blaine Amendment was to *allow* and *promote* a generically Christian form of religious education, not suffocate it. California's Blaine Amendment, as originally understood, doesn't prohibit the reading of the Bible or even the teaching of Christianity in public schools. *See* Cal. Const. art. IX, § 8. Far from it. The amendment purports to ban the teaching of "sectarian" or "denominational" doctrine in public schools—it does not purport to purge religious doctrine from public schools altogether. *Id.* The fact that so many legal scholars and jurists have uncritically adopted such an obviously anachronistic misreading of California's Blaine Amendment (and other states' similar provisions) says much more about them and our modern legal culture than it does about what those provisions actually mean.

Skeptical? I thought you might be, so I bring receipts. Textbooks that were widely used in public schools in the era when California's and most other Blaine Amendments were enacted prove that *nobody* would have understood "sectarian" to mean "religious" then. Take McGuffey's Readers, a "series of elementary school reading books that

were widely used in American schools beginning in the 1830s" and which "taught more Americans to read than any other textbook." Samuel James Smith, *McGuffey Readers*, Encyclopedia Britannica (Feb. 2, 2018), https://www.britannica.com/topic/McGuffey-Readers (last visited Feb. 17. 2026); *see also People v. Bd. of Educ. of Oakland*, 55 Cal. 331, 333 (1880) (noting that "the McGuffey series of Readers were by law in general use in the public schools" of Oakland from 1873–1880). The edition of McGuffey's Reader that was published the same year that California enacted its Blaine Amendment contains many references to Christian doctrine, even though the book was a reading text, not a theology text. *See, e.g.*, McGuffey's Second Eclectic Reader 34 (1879) ("Are you not a sunbeam, / Child, whose life is glad / With an inner brightness / Sunshine never had? / Oh, as God has blessed you, / Scatter light divine! / For there is no sunbeam / But must die or shine."); *id.* at 87 ("Know that I'm not lonely / That I ne'er despair: / God is in the shadow / God is everywhere."); *id.* at 119 ("I know God made the sun / To fill the day with light; / He made the twinkling stars / To shine all through the night."); *id.* at 130 ("Ever gentle, meek, and mild, / Though didst nurse thy fretful child, / Teach these little feet the road / Leading on to heaven and God.").

Or consider the Pacific Coast Reader, which was published in San Francisco and which was adopted by the California Board of Education just four years before the state's Blaine Amendment was ratified. *See* Stella Haverland Rouse, *Textbook Costs Worried Many Parents*, Ancestors West: A quarterly publication for the members of the Santa Barbara Cnty. Genealogical Soc'y, Fall 2018, at 8. From that text, California students learned to read by practicing sentences like these:

- 1. Here is a fine church in the midst of shade-trees. 2. Just back of it is the church-yard. Here, in the green grass, is a newly made grave. 3. A dear young boy has just died, and been laid here in his last sleep. The birds still sing in the trees, but he hears them no more. 4. In life he was good and kind to all, and now, though his friends mourn his loss, they know that he is with God, in that home where sin and death are not known. 5. Young and old, rich and poor, lie in the church-yard side by side, in the rest that waits for us all.

- God sends the rain and winds and storms, all in love. When the shower is over, we shall see all things fresher and brighter than before.

- Each little flower that opens, / Each little bird that sings— / God made their glowing colors, / He made their tiny wings / … The tall trees in the green-wood, / The meadows where we play, / The flowers in the valleys, / We gather every day— / … He gave us eyes to see them, / And tongues, that we

may tell / The goodness of the Father, / Who "doeth all things well"

- One rule, to guide us in our life, / Is always good and true: / "Do unto others as you would / That they should do to you."

- How thankful we should be to God, who gives us all these lovely flowers, which cheer and brighten our homes and our hearts!

The Pacific Coast Second Reader, Revised Edition 33, 49, 71, 78, 86 (1875).

And the textbooks used in California public schools *after* California's Blaine Amendment was enacted in 1879 show more of the same. In 1884, the state began printing its own textbooks for use in the public schools. *See* California Textbooks, *Stanford University Libraries*, https://exhibits.stanford.edu/venezky/feature/california-textbooks [https://perma.cc/3RVL-TGCW]. Those textbooks—like the McGuffey and Pacific Coast Readers—are filled with references to Christian, religious doctrine. *See, e.g.*, California State Series of School Text-Books: Speller 192 (W. H. V. Raymond ed., 1886) ("Christ [rebuked] Peter for his presumption."); California State Series of School Text-Books: Third Reader 16 (1886) ("Courage, brother! do not stumble, / Though thy path be dark as night; / There's a star to guide the humble— / Trust in God and do the right."); *id.* at 63–64 ("But He who made the sun is more glorious than the sun. The eye cannot look on His dazzling brightness. He seeth all dark places, by night as well as by day. The light of His countenance is over all the world. … This great Being is God. He made all things, but He is more excellent than all that He has made.

He is the Creator, they are the creatures.  They may be beautiful, but He is beauty.  They may be strong, but He is strength.  They may be perfect, but He is perfection.").[1]

The takeaway is clear enough: both before and after California's Blaine Amendment went into effect, explicitly religious Christian doctrine was commonplace in California public schools.  So we should stop pretending that California's Blaine Amendment was ever meant or originally applied to ban all "religious" content from public education.  It was meant to ban only *some* religious content—that deemed too "sectarian" or "denominational"—while welcoming other more generic, "nonsectarian" Christian content.

In short, California's Blaine Amendment was meant and applied to discriminate based on religion—not between the religious and the secular, as California and the panel have wrongly assumed, but instead between some religious content and other religious content.

## II.

Once California's Blaine Amendment is properly interpreted as allowing some religious content but not other religious content—that is, to openly discriminate *between* religious beliefs—then this becomes an exceedingly easy case.  Nobody thinks the government can do *that*.  Judge Bumatay, buttressed by modern Supreme Court decisions that hew closer to the First Amendment's original meaning,

---

[1] Statements like "God is great, and God is good; God created me and all things; the Bible is God's Word, and it is true; and I learn in order to serve God and others" would not be out of place in these materials.  Yet it is precisely those statements that the defendants and the panel assumed to be "sectarian."  Amended Panel Op. 10.

correctly explains why the panel was wrong in concluding that California can constitutionally discriminate against the religious vis-à-vis the secular.  But the panel was asking the wrong question.   California's Blaine Amendment was clearly designed (and applied) to disadvantage some ("sectarian") religious content against other ("nonsectarian") religious and secular content.  California cannot justify its open discrimination against religion in this case by pointing to a state provision that discriminates *between* religious viewpoints.

While the Supreme Court is still wrestling with when and whether the government can disadvantage religious content or viewpoints vis-à-vis their secular counterparts, the Court has emphatically condemned differential treatment of competing religious convictions.   Just recently, the unanimous Court did so in *Catholic Charities*.  *See* 605 U.S. at 254.   But the Court has articulated and enforced the requirement of government neutrality between religious doctrines for decades, which is why *Catholic Charities* was not a "hard call[.]"  *Id.*; *see, e.g.*, *Everson v. Bd. of Educ. of Ewing Twp.*, 330 U.S. 1, 15 (1947); *Zorach v. Clauson*, 343 U.S. 306, 314 (1952); *Larson v. Valente*, 456 U.S. 228, 246 (1982).  So have the circuit courts, including our own.  *See, e.g.*, *Marrero-Mendez v. Calixto-Rodriguez*, 830 F.3d 38, 44 (1st Cir. 2016); *Cooper v. U.S. Postal Serv.*, 577 F.3d 479, 494 (2d Cir. 2009); *Hilsenrath on behalf of C.H. v. Sch. Dist. of Chathams*, 136 F.4th 484, 493 n.75 (3d Cir. 2025), *cert. denied sub nom. Hilsenrath v. Chathams Sch. Dist. Bd. of Educ.*, No. 25-256, 2025 WL 3506995 (U.S. Dec. 8, 2025); *Myers v. Loudoun Cnty. Pub. Schs.*, 418 F.3d 395, 403 (4th Cir. 2005); *Croft v. Perry*, 624 F.3d 157, 169 (5th Cir. 2010); *Maye v. Klee*, 915 F.3d 1076, 1084 (6th Cir. 2019); *Ctr. for Inquiry, Inc. v. Marion Cir. Ct. Clerk*, 758 F.3d 869, 874 (7th

Cir. 2014); *Child.'s Healthcare is a Legal Duty, Inc. v. Min De Parle*, 212 F.3d 1084, 1090 (8th Cir. 2000); *Hartmann v. Cal. Dep't of Corrs. & Rehab.*, 707 F.3d 1114, 1125–26 (9th Cir. 2013); *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1257 (10th Cir. 2008); *Ray v. Comm'r, Ala. Dep't of Corrs.*, 915 F.3d 689, 696 (11th Cir. 2019); *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 302 (D.C. Cir. 2006).

When a state law discriminates between religion doctrines, it must satisfy strict scrutiny to survive judicial review. *Larson*, 456 U.S. at 246. Application of California's discriminatory Blaine Amendment should be subject to that demanding standard, a standard that nobody argues California can satisfy.

## III.

But if everyone (including California's own Department of Education) has simply erroneously taken for granted that the term "sectarian" describes *all* religious doctrines, then does the real meaning of California's Blaine Amendment matter? It does, for several reasons.

It is axiomatic that, to accurately assess the constitutionality of a state law, we must accurately interpret the state law at issue. Suppose a southern state, in the Jim Crow era, enacted a state constitutional amendment that said: "No African-American may swim at any public swimming pool in this state." If the statute faced a constitutional challenge in federal court, but the federal court interpreted "African-American" to mean "person of any race," then the clearly erroneous interpretation would fundamentally transform the nature of the constitutional issue. And the federal court's erroneous interpretation might even save the unconstitutional statute from invalidation—at

the very least, it would transform a clear-cut, facial Equal Protection violation into a much-less-clear-cut case about whether people have a federal constitutional right to swim in public swimming pools.

True, when interpreting state law, we are generally "bound by the decision of the highest state court." *Kekauoha-Alisa v. Ameriquest Mortg. Co.* (*In re Kekauoha-Alisa*), 674 F.3d 1083, 1087 (9th Cir. 2012) (citation omitted); *but see Oxborrow v. Eikenberry*, 877 F.2d 1395, 1399 (9th Cir. 1989) (recognizing an exception to this rule in the context of federal habeas corpus where the state court's interpretation of state law "is untenable or amounts to a subterfuge to avoid federal review of a constitutional violation" (citation omitted)).  But even assuming we could be bound by an atextual, clearly erroneous California Supreme Court holding that "sectarian" now simply means "religious" in the context of California's Blaine Amendment, no party has pointed to any California Supreme Court (or, for that matter, any other California court) decision that has held any such thing.  While the California Department of Education (a state agency) has, in this litigation, registered its view that "sectarian" means "religious," its view is entitled to no deference.  *See, e.g.*, *Larson*, 456 U.S. at 246 n.23 (rejecting the state attorney general's argument that the challenged state statute was "facially neutral," because the statute "ma[de] explicit and deliberate distinctions between different religious organizations"); *Stenberg v. Carhart*, 530 U.S. 914, 940 (2000) (rejecting a state attorney general's narrowing interpretation of a challenged state law, because Supreme Court precedent "warns against accepting as 'authoritative' an Attorney General's interpretation of state law when 'the Attorney General does not bind the state courts or local law

enforcement authorities'" (quoting *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 395 (1988))).

That leaves us, then, with California's rules of constitutional interpretation. *See Killgore v. SpecPro Pro. Svcs., LLC*, 51 F.4th 973, 983 (9th Cir. 2022) ("In interpreting a state statute, we must follow the state's rules of statutory interpretation, here California." (citing *Bass v. Cnty. of Butte*, 458 F.3d 978, 981 (9th Cir. 2006))). "We begin by examining the constitutional text, giving words their ordinary meanings." *Howard Jarvis Taxpayers Ass'n v. Amador Water Agency*, 36 Cal. App. 5th 279, 296 (2019). The words of the provision at issue must "be interpreted in the sense in which they would have been understood at the time of the enactment." *People v. Cruz*, 13 Cal. 4th 764, 775 (1996) (citations omitted). If the text is clear, then "we look no further." *Killgore*, 51 F.4th at 983 (quoting *Renee J. v. Super. Ct.*, 26 Cal. 4th 735, 743 (2001)).

As explained above, the text of California's Blaine Amendment (consistent the context of its historical application) leaves no doubt: "sectarian" isn't just another word for "religious." It's a descriptor for some religious doctrines, but not others, making plain that the provision requires discrimination between religious doctrines.**[2]**

---

[2] Both the California and United States Supreme Courts have recognized that, "[a] fundamental canon of statutory interpretation requires that a statute be construed to avoid unconstitutionality if it can reasonably be so interpreted." *In re Klor*, 64 Cal. 2d 816, 821 (1966) (first citing *Lynch v. Overholser*, 369 U.S. 705, 710–11 (1962); and then citing *Geiger v. Bd. of Supervisors*, 48 Cal. 2d 832, 839 (1957)). For two reasons, this canon does not change the equation here. First, as explained above, the "sectarian means religious" interpretation is not a reasonable interpretation—it's an obvious *re*interpretation. Second, as Judge

Even if our understandings of the role of religion in education and our connotations of the word "sectarian" have shifted since 1879, California's Blaine Amendment still means what it says. We can't escape the conclusion that the Amendment "makes explicit and deliberate distinctions between different religious" doctrines. *Larson*, 456 U.S. at 246 n.23. Since we can't escape that conclusion, our court should have taken the logical next step and invalidated this application of California's Blaine Amendment on federal constitutional grounds.

## IV.

It's about time that we leave facially discriminatory Blaine Amendments like California's on the ash heap of constitutional history. As applied today, states like California are trying to repurpose them to excise religion from the public square in ways that the generation that adopted them wouldn't have fathomed. On their face, they discriminate between religious doctrines in a manner that the Religion Clauses of the First Amendment clearly do not permit. We should have reheard this case en banc to correct the panel's erroneous decision to uphold the blatantly discriminatory application of this unconstitutional state law, and I respectfully dissent from our court's failure to do so.

---

Bumatay explains, even *that* misinterpretation renders California's Blaine Amendment unconstitutional as applied here.